[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 25, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-11137

_____

D.C. Docket No. 01-06258-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WALTER J. BROWNE,
a.k.a. Buster,
PATRICIA A. DEVANEY,
a.k.a. Patricia Browne,
a.k.a. Patricia Cardone,
a.k.a. Patricia Browne Cardone,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 25, 2007)**

Before TJOFLAT and HULL, Circuit Judges, and RESTANI,[*] Judge.

TJOFLAT, Circuit Judge:

The crimes in this case arose from the activities of Walter J. Browne and his sister, Patricia A. Devaney, as a high-ranking official and administrative assistant, respectively, in two labor unions. Accused of lining their pockets by abusing their positions in the unions, the defendants in this brother-and-sister operation were prosecuted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Taft-Hartley Act, and other federal statutes proscribing embezzlement and fraud. After a two-month joint trial, Browne was convicted of eight counts and acquitted of seven counts, and Devaney was convicted of nine counts and acquitted of six counts. The Government obtained an order of forfeiture for which the defendants were held jointly and severally liable. In addition, the defendants received prison sentences, and Devaney was ordered to pay restitution. Both now appeal, contesting the legal and factual support for their RICO and Taft-Hartley Act convictions, the district court's denial of severance, and the order of forfeiture.

We affirm the defendants' convictions and sentences in all respects. The

_____

[*] Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

structure of the opinion is as follows: Part I provides the facts relevant for purposes of this appeal. Part II describes the charges against the defendants and the proceedings in the district court. Parts III through VI examine the issues raised on appeal by the defendants.

I.

As an understanding of the membership and organizational structure of the two labor unions is crucial to this appeal, we first describe these unions, the defendants' involvement therewith, and the incidents leading to prosecution.

Founded in 1875, District 1-Marine Engineers Beneficial Association ("D1-MEBA") is an AFL-CIO-chartered labor organization headquartered in Washington, D.C. Throughout the relevant period, D1-MEBA represented both licensed and unlicensed seamen in its maritime divisions.[1] These seamen served on all manner of ships, including ships in international commerce, ready reserve force vessels, military sealift command ships, National Oceanic and Atmospheric Administration research vessels, ships of institutions such as Scripps Research Institute and Woods Hole Research Center, and Staten Island ferries.

---

[1] Licensed seamen include captains, mates (first, second, and third), and engineers (chief, first-assistant, second-assistant, and third-assistant). Unlicensed seamen primarily take direction from the officers, and usually outnumber licensed seamen on a vessel. However, not all licensed seamen are deemed supervisors for collective bargaining purposes; generally, captains, first mates, and chief and first-assistant engineers are considered supervisors.

In addition to representing seamen, D1-MEBA also represented non-maritime workers. In its Professional Office Industrial Division ("POID"), D1-MEBA represented land-based employees who handled the freight and offices of shipping companies whose maritime employees were represented by D1-MEBA's maritime divisions. D1-MEBA also represented various public-sector employees, ranging from school bus drivers to custodial workers, in its Federation of Public Employees ("D1-MEBA/FOPE") division, which was headquartered in Broward County, Florida. Although POID and D1-MEBA/FOPE were administered as separate divisions, their members were considered full voting members of D1-MEBA.

Walter J. "Buster" Browne became executive director of D1-MEBA/FOPE in 1977. Under Browne's leadership, the membership of D1-MEBA/FOPE grew steadily. In 1988, D1-MEBA merged with the National Maritime Union, a union that primarily represented unlicensed seamen, and became D1-MEBA/NMU. Sometime thereafter, Browne was forced out of the newly merged entity by D1-MEBA president Gene DeFries. Browne went to Washington, D.C., and became involved in a movement to oust DeFries. The merger did not last; DeFries and

others were indicted on charges including election rigging and embezzlement,[2] and in late 1991, D1-MEBA voted to secede and reconstitute itself as an autonomous entity under its original name. It retained a number of unlicensed seamen who worked on state-operated ferries in Alaska and Washington state. In 1992, the new leadership of D1-MEBA restored Browne to his former position as D1-MEBA/FOPE's executive director.

During the fall of 1993, Browne's sister, Patricia A. Devaney, attempted suicide by ingesting a large quantity of pills and alcohol. The failed attempt was precipitated by her depression, heavy drinking, and the loss of her job at the Broward County sheriff's office. After receiving psychiatric and rehabilitative treatment, Devaney moved into Browne's house. Browne hired Devaney as his administrative assistant and gave her a car. Although Devaney initially performed clerical work, she later began taking charge of the division's finances, causing the office manager who had previously handled the finances to become offended and to quit.

As executive director, Browne was permitted to make union-related telephone calls on union cell phones and union calling cards. He was also

---

[2] Browne was named in the same indictment for his role in rigging the election in favor of DeFries, to which he pled guilty.

permitted to incur certain entertainment and travel expenses, so long as they were related to the union's business. Under the Labor Management Reporting and Disclosure Act, the union was required to file a Labor Organization Annual Report, or LM-2, detailing financial receipts and disbursements, including union-related expenditures, and to retain sufficient records documenting and explaining such transactions for at least five years. See 29 U.S.C. §§ 431(b), 436; 29 C.F.R. § 403.3. Accordingly, D1-MEBA regulations required that each employee personally complete expense vouchers and attach substantiating documents justifying the expenses, such as receipts. Contrary to these regulations, Devaney often completed Browne's expense vouchers. Furthermore, D1-MEBA accountants noticed that supporting documentation for expenses charged to Browne's union credit card was frequently late or missing.

In October 1993, Browne began working as a lobbyist and consultant for Hvide Marine, Inc. ("Hvide"), a marine company operating out of Port Everglades in Broward County. Browne accepted monthly payments from Hvide from October 1993 to July 1998. In total, these payments amounted to $254,000.

By late 1993, the swelling ranks of D1-MEBA/FOPE and POID members began to generate friction. Because of previous attempts by leaders of the former merged entity to marshal the increasing number of votes held by members of D1-

6

MEBA/FOPE and POID, members of the maritime divisions feared that those non-maritime divisions would eventually dilute the traditional maritime focus of the union. For their part, members of D1-MEBA/FOPE and POID believed they would be better served by a separate union. D1-MEBA therefore decided to create an autonomous affiliate union, the National Federation of Public and Private Employees ("NFOPAPE"), to represent directly the bargaining units of D1-MEBA/FOPE and POID.

With the help of a $250,000 loan from D1-MEBA, NFOPAPE headquarters were established in Fort Lauderdale, Florida. The new union was organized into two divisions: the Federation of Private Employees and the Federation of Public Employees. Browne was named president of NFOPAPE and divisional president of the Federation of Public Employees. Devaney also began working for NFOPAPE, answering to both Browne and Gilbert Carrillo, who was hired as in-house counsel of the Federation of Public Employees.

Browne was keen to establish NFOPAPE's autonomy from D1-MEBA and its Washington, D.C. headquarters. He directed the drafting of NFOPAPE's own constitution to ensure that, despite its affiliation with D1-MEBA, NFOPAPE would have its own structure and identity. Under the affiliation agreement, bargaining units from D1-MEBA would be transferred by election to NFOPAPE.

7

Upon NFOPAPE's creation, POID's bargaining units were transferred to the Federation of Private Employees. In addition, approximately half of D1-MEBA/FOPE's bargaining units were transferred to the Federation of Public Employees; the remaining units were retained by D1-MEBA until they were likewise transferred by late 1996 or early 1997. Thus, Browne continued to serve as D1-MEBA/FOPE's executive director for a couple years, remaining on D1-MEBA's payroll.

As with his position at D1-MEBA, Browne's positions at NFOPAPE also permitted him to incur travel and entertainment expenses related to union business, for which he could be reimbursed by personally submitting expense vouchers and substantiating documentation. In addition, NFOPAPE policy required the secretary/treasurer to approve such expenses. Under the division bylaws of the Federation of Public Employees, it was also the responsibility of the secretary-treasurer, together with the divisional president, to maintain custody of the books and records, to supervise the financial accounts, to give financial reports at membership meetings, and to sign checks for disbursement from the division's accounts.

Shortly after NFOPAPE's formation, Browne hired George Zakaib as the secretary-treasurer of the Federation of Public Employees. Zakaib was a former

custodian and repairman who served as shop steward of the custodial unit. He had never attended college, had no financial training, and had never been involved in union finances. As secretary-treasurer, Zakaib primarily worked as a recruiter of new members. At membership meetings, his sole responsibilities were to lead the pledge of allegiance and to handle the raffle tickets. Zakaib did not have access to the union's books and records, never signed payroll checks, and never reviewed union credit card bills, bank statements, entertainment expenses, or travel expenses. Rather, it was Devaney who handled the union's books and records, received and paid bills, processed expense vouchers, and managed payroll. On several occasions, Zakaib complained to Devaney and requested the opportunity to review the union's books and records, but Devaney told him to "go fishing." Devaney complained to Browne that Zakaib was "starting a ruckus" about the records, to which Browne responded that he would "take care of it." Zakaib also complained to Carrillo and Browne, even threatening to resign. Although Browne assured Zakaib that he would "take care of it," Zakaib's duties did not change.

Despite having shown initial improvement after her treatment, Devaney had eventually relapsed into heavy drinking and depression. Carrillo became seriously concerned that Devaney's drinking problems rendered her unfit to handle the union's finances, and feared that Devaney's use of a union car would create

9

liability issues for the union. Carrillo spoke with Browne on more than one occasion, requesting that Browne take the union car away from Devaney and place Devaney in a rehabilitation program. Browne did not do so.

In 1995 and 1996, an accountant retained by the union, George Maribella, indicated to NFOPAPE officials that additional internal controls over the union's accounting functions were necessary. In August or September 1996, a dispute arose over NFOPAPE's repayment of the $250,000 loan from D1-MEBA. D1-MEBA President Alexander Shandrowsky wrote a letter to Browne requesting permission to audit the books and records of NFOPAPE, which Browne refused. Flanked by D1-MEBA officials and an independent auditor, Shandrowsky then paid a visit to NFOPAPE headquarters. Browne again refused to allow access to the financial records. In October 1996, Shandrowsky terminated Browne as executive director of D1-MEBA/FOPE, primarily because of Browne's refusal to permit D1-MEBA to audit NFOPAPE's books and records, but also because he believed that Browne was attempting to "raid" units in the Broward County area that were represented by other labor organizations. Following his termination from D1-MEBA, NFOPAPE took over responsibility for Browne's salary.

In late 1996, NFOPAPE retained an outside accounting firm to audit the union's financial statements going forward. One of that firm's partners, Nadine

10

Bellows, had several occasions to report on the audited financial statements at the union's membership meetings. In her letters to union management, Bellows noted that the union's internal controls were "weak or non-existent," because Devaney was handling the bulk of the bookkeeping and financial duties. She recommended that such duties be divided among several persons, to provide for segregation of duties pursuant to standard accounting procedures. As of her year-end audit for 1999, Bellows noted that none of the previous years' recommendations had been implemented by the union.

Beginning in 1997, Devaney began authorizing increased payments to herself through payroll. She also issued checks to her husband, who had previously been employed as consultant to the union, and cashed the checks herself. In 1999, the union hired Tina Kaiser as a bookkeeper. Kaiser noticed suspicious bonus checks issued to Devaney and her husband. Not wanting to approach Browne, Kaiser mentioned her observations to several other union officials, including Pat Lambert, a union representative at the Broward County sheriff's office. At the Labor Day picnic in September 1999, Lambert informed Browne that Devaney was stealing from the union. In November 1999, Devaney altered her payroll scheme. Rather than issuing checks to herself or her husband, she began issuing unwarranted payroll checks to her daughter, who edited the

11

union newsletter. Devaney then cashed the checks herself.

In March 2000, Devaney went from a full-time to a part-time employee of the union in order to work for the Broward County sheriff's office. When she requested her vacation pay in advance, Kaiser informed a union official that Devaney had already received her vacation pay. The ensuing investigation revealed that Devaney had embezzled $116,207.66 from payroll, and she was terminated. On May 16 of that year, Devaney sent the union a letter of apology and a check for $1,500 as voluntary restitution. After the sale of her condo for $56,000, Devaney bought herself a new car for $21,000 and sent the union a $25,000 check on October 21.

## II.

On May 8, 2003, a Southern District of Florida grand jury returned a twenty-count, second superseding indictment charging Browne and Devaney with various offenses. Count 1 charged both defendants with conspiring to violate RICO.[3] Count 2 charged both defendants with a substantive violation of RICO[4]

---

[3] 18 U.S.C. § 1962(d) makes it unlawful for any person to conspire with any other person to violate §§ 1962(a), 1962(b), or 1962(c).

[4] 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

and listed fifteen predicate acts committed by Browne, Devaney, or both.

Counts 3 through 6 charged Browne with accepting payments from certain employers in violation of §§ 302(b)(1) and (d)(2) of the Taft-Hartley Act.  <u>See</u> 29 U.S.C. §§ 186(b)(1), (d)(2).[5]

Count 7 charged Browne with committing "honest services" mail fraud in violation of 18 U.S.C. § 1341.[6]

Counts 8 and 9 charged both defendants and Devaney alone, respectively, with embezzlement from a labor union in violation of 29 U.S.C. § 501(c).[7]

Count 10 charged Devaney under 18 U.S.C. § 1344 for bank fraud.[8]

Counts 11 through 18 charged both defendants with committing mail fraud in violation of 18 U.S.C. § 1341 by submitting expense vouchers for the

---

[5] 29 U.S.C. § 186 prohibits any person from requesting, demanding, receiving, accepting, or agreeing to receive or accept, any thing of value from certain employers.

[6] The federal mail fraud statute makes it unlawful to use the United States mails in furtherance of "any scheme or artifice to defraud, or [to] obtain[] money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1341.  In 1988, Congress broadened the mail fraud statute so that in addition to protecting against schemes to obtain money and property, the term "scheme or artifice to defraud" includes schemes to deprive individuals of "the intangible right of honest services."  18 U.S.C. § 1346.

[7] 29 U.S.C. § 501(c) prohibits any person from embezzling the assets of a labor organization of which he is an officer or employee.

[8] The federal bank fraud statute prohibits any person from executing or attempting to execute a scheme or artifice (1) to defraud a financial institution, or (2) to obtain any of the assets owned by a financial institution by fraudulent means.  18 U.S.C. § 1344.

reimbursement of personal expenses.

Count 19 charged Browne and Devaney with failing to maintain labor organization records in violation of 29 U.S.C. § 439(a).[9]  Count 20 charged Devaney under 29 U.S.C. § 439(c) for destroying and falsifying records related to the union's payroll.[10]

Finally, the indictment included a forfeiture count against both defendants, seeking forfeiture pursuant to 18 U.S.C. § 1963 in the event of conviction under Counts 1 or 2.[11]

Browne filed two pretrial motions for severance which were denied.  The defendants were tried in a joint trial beginning on April 5, 2004.  At the close of the Government's case, the defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on certain counts.  The district court subsequently granted Browne acquittals on the mail fraud charges in Counts 17

---

[9] 29 U.S.C. § 439(a) requires every labor union to submit to the Secretary of Labor an annual financial report (known as forms LM-2 or LM-3) of salaries, allowances, reimbursed expenses, and other disbursements to all officers and to employees receiving more than $10,000, and to maintain supporting documentation thereof.

[10] 29 U.S.C. § 439(c) prohibits the willful making of false entries or concealing, withholding, or destroying any records required to be kept in connection with 29 U.S.C. §§ 431 and 433.

[11] In pertinent part, 18 U.S.C. § 1963 mandates forfeiture of any interest acquired or maintained in violation of 18 U.S.C. § 1962, and any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of § 1962.  18 U.S.C. § 1963(a)(1), (3).

and 18, which also eliminated Predicate Act 15 of Count 2, but reserved ruling on the remainder of the counts. The defendants renewed their Rule 29 motions at the close of all the evidence, on which the district court reserved decision.

On June 2, 2004, the jury found Browne guilty of Counts 1-3, 7, 12-14, and 19. With respect to the substantive RICO violation, Count 2, he was found to have committed Predicate Acts 1, 2, 4, 13, and 14. Devaney was found guilty of Counts 1, 2, 9, 10, 13, and 17-20. The jury found that she had committed Predicate Acts 10-14 of Count 2.

Following sentencing hearings, Browne received concurrent prison sentences of 70 months for Counts 1, 2, and 7, 60 months on Counts 3, 12-14, and 12 months on Count 19. He also received three years' supervised release for Counts 1-3, 12-14, and one year for Count 19. Devaney received concurrent sentences of 27 months' imprisonment for Counts 1, 2, 9, 10, 13, 17, and 18, and 12 months on Counts 19-20. She also received five years' supervised release and was ordered to pay $87,100 in restitution.[12] Finally, the defendants were held jointly and severally liable under an order of forfeiture in the amount of $592,271.32.

---

[12] NFOPAPE's insurer, Ulico Casualty Company, paid NFOPAPE $87,100 for the losses related to Devaney's payroll embezzlement.

The district court denied the defendants' motions for judgment of acquittal and for new trial. Each defendant timely appealed.

III.

Browne first argues that the district court erred in interpreting the criminal section of the Taft-Hartley Act on which several of the counts against him were based. See Labor Management Relations (Taft-Hartley) Act § 302 (as amended), 29 U.S.C. § 186. The indictment contained four counts alleging separate violations by Browne of that section of the Act. Section 186 also served as the basis for eight of the predicate acts alleged against Browne in support of the substantive RICO count. The jury ultimately found Browne guilty of one Taft-Hartley count and that he had committed three of the Taft-Hartley predicate acts alleged in Count 2. These counts and predicate acts will be described in greater detail, infra.

Browne argues that, under the proper interpretation of the statute, the evidence adduced by the Government at trial is insufficient to support his conviction on the Taft-Hartley count and the jury's findings of culpability on the three Taft-Hartley predicate acts. As such, he suggests that he is entitled to entry of a judgment of acquittal on these counts. Alternatively, he argues that the district court erred in denying his request for a jury instruction defining the term

16

"employee" to exclude supervisors, thus requiring a new trial on the Taft-Hartley

count and two of the three predicate acts that the jury found Browne had

committed. Ultimately, he argues, the infirmities of the Taft-Hartley count and

predicate acts fatally undermine the remaining counts on which he was convicted

– including the most serious RICO counts.[13]

Our review of this issue proceeds as follows. We begin in part III.A by

determining the proper interpretation of § 186, then examining the sufficiency of

the evidence to support Browne's conviction on the Taft-Hartley violation alleged

in Count 3, which was also alleged as Predicate Act 1. We then consider in part

III.B the remaining two Taft-Hartley predicate acts that the jury found Browne had

---

[13] Although Browne speaks broadly of his entitlement to a new trial on all counts on which he was convicted, his brief specifically identifies the RICO conspiracy count, Count 1, the substantive RICO count, Count 2, and the theft-of-honest-services mail fraud count, Count 7, as those which were directly implicated by the purported failure of proof of the Taft-Hartley Act count and predicate acts. We discuss the viability of Browne's convictions on these three related counts in part II.B., infra.

Although Browne's initial brief proposes that he receive a new trial on these three counts, his arguments generally reiterate the sufficiency of evidence challenge that he made in his unsuccessful Rule 29 motion at the close of evidence at the trial. The remedy for a successful sufficiency challenge under Rule 29 would be entry of judgment of acquittal, not a new trial, but it matters not. We treat his argument as a sufficiency challenge, and we ultimately determine that it must fail. To the extent Browne intended to argue separately that he is entitled to a new trial in the interest of justice on Counts 1, 2, and 7 because of the insufficiency of the challenged predicate acts, see Fed. R. Crim. P. 33(a), we deem such an argument waived. See Fed. R. Appellate P. 28(a)(9). Browne did not provide any reasoning or citations in his brief on appeal to support such an argument, nor do we find any evidence in our independent review of the record that Browne moved the district court for a new trial on the ground of the insufficiency of the predicate acts. After the verdict, Browne did move the district court for a new trial on severance grounds, see part III, infra, but he specifically requested only judgment of acquittal on Counts 1, 2, and 7.

17

committed, as well as Browne's convictions for the substantive RICO violation, RICO conspiracy, and "honest services" mail fraud. In part III.C, we address Browne's argument challenging the jury instructions on certain of the Taft-Hartley charges.

A.

The Taft-Hartley Act, as amended, regulates various aspects of labor organizations and practices, but in part, the Act serves as "a conflict-of-interest statute designed to eliminate practices that have the potential for corrupting the labor movement." United States v. Phillips, 19 F.3d 1565, 1574 (11th Cir. 1994), amended on other grounds by 59 F.3d 1095 (11th Cir. 1995). To this end, § 186 generally prohibits employers in industries affecting commerce from paying anything of value to labor organizations or their officials, and conversely prohibits labor representatives from receiving anything of value from employers. See id.

Browne was charged in Counts 3-6 of the second superseding indictment, and in Predicate Acts 1-8 under the substantive RICO count (Count 2), with violations of § 186(b)(1). That subsection provides, in pertinent part: "It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." 29 U.S.C. § 186(b)(1). Subsection

18

(a), in turn, establishes four sets of circumstances under which the employer who makes or agrees to the prohibited payment may be criminally liable; thus, the liability of the recipient of the prohibited payment is coextensive with that of the employer. The Government framed each Taft-Hartley count and predicate act in the indictment with reference to payments prohibited by § 186(a)(2) specifically, which provides in pertinent part:

> It shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value . . . to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or <u>would admit to membership</u>, any of the <u>employees</u> of such employer who are employed in an industry affecting commerce[.]

29 U.S.C. § 186(a), (a)(2) (emphases added).

The jury found Browne guilty of Count 3 and found that he had committed Predicate Acts 1, 2, and 4 of Count 2. Each count and each predicate act alleged that Browne unlawfully received monetary payments from a different employer whose employees D1-MEBA and/or NFOPAPE would have admitted to membership. Count 3 and Predicate Act 1 alleged the same conduct – namely, that between October 1993 and July 1998, Browne accepted approximately $250,000 from Hvide. Predicate Act 2 alleged that Browne accepted approximately $12,500 from April to October 1995 from an agent of Coastal Gaming Group, Inc. ("Coastal Gaming"), which was doing business as International Cruises, Inc. In

19

Predicate Act 4, the Government alleged that Browne accepted approximately $4,000 between September 1994 and July 1996 from the owner of Coleary Transport, Inc. ("Coleary Transport").

Browne contests the district court's interpretations of two provisions of § 186 as they relate to the Government's case on each of these counts. First, he argues that the district court erred in ruling that the term "employee," as used in § 186(a)(2), includes supervisors. Under Browne's interpretation, supervisors are excluded from the definition of "employee" by the terms of the applicable definition sections in Title 29. Thus, he asserts, the proper interpretation of the term "employee" renders insupportable the jury's findings on Count 3 and Predicate Acts 1 and 2 of Count 2, all of which involve what Browne characterizes as negotiations for his unions to provide only supervisory employees to potential employers.

Second, Browne argues that the district court erred in interpreting the term "would admit to membership" as used in § 186(a)(2). In short, Browne suggests that the district court interpreted this provision too broadly, allowing the jury to convict him of Count 3 and find him responsible for each of the three predicate acts on the basis of evidence that, in his estimation, was insufficient to prove what is required under the statute – namely, an existing employment relationship

between the employer in question and members of the union.

For reasons that will be explained infra, this appeal does not require us to interpret definitively the term "employee." As such, we leave that issue for another day, and for the limited purpose of discussion here, we assume that Browne is correct in his assertion that the term "employee" in § 186 does not include supervisors. Instead, we focus our attention on the "would admit to membership" provision. Ultimately, we must determine what elements of proof are required of the Government to obtain a conviction under the Act, and against those we measure the sufficiency of the evidence on each of the contested counts and predicate acts.

1.

With regard to the "would admit to membership" provision of § 186(a)(2), Browne argues that the district court applied an "unduly broad interpretation" in deciding his motions for judgment of acquittal. Browne suggests that the district court erred in its consideration of his sufficiency of evidence challenge to the Taft-Hartley counts because the court focused its analysis on whether the employers at issue "had the present intent . . . to employ" members of D1-MEBA or NFOPAPE by hiring them for positions that had yet to be created but would be

21

filled in the future.[14]  In his view, in order for the Government to sustain its burden

of proof under the "would admit to membership" clause, it must prove "an existing

employment relationship between the employer and union members."

When construing a criminal statute, we begin with the plain language;

---

[14] In essence, Browne suggests that the district court's application of a "present intent to employ" standard caused the court to deny entry of a judgment of acquittal on the basis of evidence pertaining to certain pre-hire agreements that Browne had negotiated with the employers on behalf of the unions.  These pre-hire agreements provided for the possible future employment of union members, not the possible future unionization of the employer's then-current employees as Browne now contends is required by the statute.

Because we review <u>de novo</u> both the interpretation of statutes and challenges to the sufficiency of evidence, we need not dwell on how the district court analyzed this issue.  We would be remiss not to note, however, that the "present intent to employ" standard applied by the district court derived directly from Browne's own proposed instruction to the jury on the "would admit to membership" clause.  In his proposed instructions submitted before the district court held its charge conference, Browne suggested the following instruction, which the court ultimately delivered to the jury:

> With respect to establishing whether NFOPAPE or District Number 1 - MEBA was a labor organization which "would admit to membership" any of the employees of the employer, the term "would admit to membership" means that at the time the acts were performed and done, there was either a present intention for the employees of the employer to apply for membership <u>or that there was a present intention for the employer to obtain work in the area and to employ employees that would or could be admitted into membership</u> in NFOPAPE or District Number 1 - MEBA.

(Emphasis added).  This language appears to have been drawn from <u>United States v. Sink</u>, 355 F. Supp. 1067, 1070–71 (E.D. Pa. 1973), which used such a standard in instructing the jury. Moreover, in its order denying Browne's post-trial motions for judgment of acquittal and new trial, the district court explicitly noted that the "present intention" standard was included in the jury instructions "[a]t the Defendants' request."

Although we cannot know for sure, Browne's recognition of his role in creating this issue likely informed his decision on appeal not to challenge the "would admit to membership" jury instruction.  Instead, he limits his argument on that clause to the sufficiency of the evidence in light of what he undoubtedly hopes will be a more favorable interpretation of the statute by this court.  In any event, we interpret the statute and consider the sufficiency of the evidence on the Taft-Hartley counts independently of the district court's rulings on these issues.

22

where "the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said." United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) (citing Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992)). By its terms, § 186(a)(2) prohibits payments by an employer to an officer of a labor organization when the labor organization "represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(2) (emphasis added). In order to be understood properly, the "would admit to membership" clause must be read in light of the subsection as a whole – specifically, the "who are employed" clause. The plain language indicates that there can be no criminal liability under § 186(a)(2) – or, by extension, for the intended recipient of a payment under § 186(b)(1) – unless, at the time the payment was made or agreed upon, the employer currently had employees who would be admitted to membership in the union. The use of the present tense ("are employed") imposes a temporal limitation on the employment status of those employees whom § 186 would protect from corrupt double-dealing between union officials and employers. Cf. Allied Chem. & Alkali Workers of America, Local

23

Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166, 92 S. Ct. 383, 391, 30 L. Ed. 2d 341 (1971) (interpreting the statutory definition of "employee" under the Taft-Hartley Act "not to be stretched beyond its plain meaning embracing only those who work for another for hire"), accord. Folsom v. Prospect Hill Resources, Inc. (In re Prospect Hill Resources, Inc.), 837 F.2d 453, 455 (11th Cir. 1988) (per curiam); Blassie v. Kroger Co., 345 F.2d 58, 68 (8th Cir. 1965) (Blackmun, J.) ("An employee ordinarily is a person presently engaged in employment.").

The few reported cases to have considered the meaning of the "would admit to membership" clause do not compel an alternative interpretation. Browne relies heavily on United States v. Cody, in which the Second Circuit reversed the conviction of a union official, holding that the "connection" between the union official and the employer was "too nebulous" to support a charge under § 186. United States v. Cody, 722 F.2d 1052, 1059 (2d Cir. 1983). The employer in Cody employed no union members at the time the union official received the thing of value (in that case, a rent-free apartment), and the court was unpersuaded by the Government's argument that the employer would have employed union members on a future building contract for which there were then no "actual plans." Id. at 1057–59.

Here, Browne draws on the language of Cody in suggesting that the "would

24

admit to membership" clause requires "an <u>existing</u> employment relationship, between the employer and <u>members of the union</u>." <u>Id.</u> at 1058 (second emphasis added). We find the reasoning of <u>Cody</u> less than persuasive on this score, however. As we have noted above, the plain language of § 186(a)(2) certainly requires an existing employment relationship, but that association need not be with <u>current</u> union members – instead, it need only be the case that the employer has an existing employment relationship with employees who <u>would be admitted</u> to the union. The court in <u>Cody</u>, responding directly to the Government's two arguments in that case, seemed to conceive of only two possible theories for a prosecution under § 186: either (1) that the employer currently employs individuals who are already union members, in which case a payment by the employer to a union official would constitute a violation,[15] or (2) that the employer would allegedly hire union members in the future, in which case there would ordinarily be no violation.[16] <u>Id.</u> Yet by its own examination of the statutory language and history,

[15] It is hardly debatable that a payment to a union official who currently represents employees of the employer would fall within the scope of § 186(a)(2), for that subsection prohibits payments to any labor organization or officer thereof "which <u>represents</u>, seeks to represent, or would admit to membership any of the employees of such employer who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(2) (emphasis added). The statutory language is quite clear in its application when current employees of the employer are already represented by the labor organization.

[16] In general, we believe that the <u>Cody</u> decision improperly emphasizes whether the "motive" behind the payments falls within the category of evils that Congress meant to address by enacting § 186. <u>See</u> <u>Cody</u>, 722 F.2d at 1058 (noting that one of the Government's theories of

25

the Cody court described a third possibility that encompasses the interpretation relevant here: "subsection (a)(2) was added . . . to deal with employers' attempts through bribery of union officials to block unionization of their present employees." Id. This interpretation is evident from the plain language of § 186(a)(2); if the "conditional verbiage" of the "would admit to membership" clause is to have any meaning, see id., Congress must have intended § 186 to capture payments to union officials when the employer employs individuals who were not yet union members. We see nothing in the statute or its legislative history to support Cody's seeming assertion that the existing employment relationship must be between the employer and current union members.[17] See id.

Thus, the relevant consideration in applying §186(a)(2)'s "would admit to membership" clause is whether the union would admit any of the employees who

liability was "too indirect to support the claim that [the union official] had sufficient leverage to extort from [the employer] or that [the employer] had any incentive to bribe [the union official]"); id. at 1059 (observing, in discussing another case, that "it could be inferred that a motive for the gift was to discourage efforts to organize the employer's workers"). As Cody itself later observes, "the employer's purpose for making a payment is irrelevant since all payments, aside from those statutorily excluded, are unlawful." Id.; see also United States v. Ryan, 350 U.S. 299, 305, 76 S. Ct. 400, 404, 100 L. Ed. 335 (1956) (dictum) (interpreting an earlier version of the § 186 as "a criminal provision, malum prohibitum, which outlaws all payments, with stated exceptions, between employer and representative"); Phillips, 19 F.3d at 1580–81 ("Congress must have intended sections 186(a)(1)–(2) to prohibit payments to representatives even if they were made without any intent to influence.") (dictum).

[17] The case cited by the Cody court in support of that proposition, Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. at 169, 92 S. Ct. at 392, does not, in our reading, bear on the question.

26

were currently working for the employer at the time the subject payment was made. We note that other courts have considered some form of a "present intent" test, under which the determination of whether a union "would admit to membership" would turn on either (a) whether the employer had, at the time of the payment, the present intent to hire individuals who either were union members or would be admitted to membership after being hired, or (b) whether the union had the present intent to admit the employer's employees at the time the payment was made. See United States v. Pecora, 798 F.2d 614, 622 (3d Cir. 1986) (considering, but ultimately rejecting, a "present intent" theory); United States v. Sink, 355 F. Supp. 1067, 1071 (E.D. Pa. 1973) (denying motions for judgment of acquittal and new trial where the jury had been instructed that "would admit to membership . . . means at the time the acts were performed and done . . . there was a present intention for [the employer] to obtain work in the Philadelphia area and to employ employees that would and could be admitted to membership in [the union]"), aff'd mem., 485 F.2d 683 (3d Cir. 1973). As the Third Circuit did in Pecora, we reject these formulations as inconsistent with the statutory language. The first suggested "present intent" test would improperly allow for liability under the "would admit to membership" clause of § 186(a)(2) in situations where the employer had no current employees who would be admitted to membership, but instead had the

present intent to hire individuals in the future who would be admitted to membership. As we have explained supra, this interpretation would be inconsistent with the statutory provisions requiring an existing employment relationship between the employer and the employees who would be admitted.[18]

---

[18] Our holding here rules out the possibility that the statute could impose criminal liability on either a union official who receives a payment, or a potential employer who makes one, while the would-be employer has no employees at that time who would be admitted. We recognize that this decision may limit the Government's ability to initiate prosecutions under § 186 when there is only a possible future employment relationship (i.e., no existing relationship) between a potential employer and individuals who would be admitted to membership in the union.

Arguably, such a result would seem to run counter to the statute's broadly stated purpose to address "instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct" among "labor organizations, employers, labor relations consultants, and their officers and representatives." Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), Pub. L. No. 86-257, § 2(b), 73 Stat. 519, 519; see also Cody, 722 F.2d at 1059 ("[T]here may be circumstances in which the possible future hiring of unionized workers might lead to abuses that § 186 was designed to prevent."); S. Rep. 86-187, at 13 (1959) (noting that amendments to the earlier version of § 186 under the Taft-Hartley Act would "strengthen[]" the statute "by making it applicable to all forms of extortion and bribery in labor-management relations some of which may slip through the present law"). For example, it may hypothetically be possible (yet probably rare) that a prospective employer, having no employees at present, could anticipate needing unionized labor in the future and – seeking to obtain a "sweetheart deal" with the union in advance – commence payoffs to a given union official. Such a scenario would seem to encompass the evils in labor-management relations that Congress meant § 186 to prevent.

Notwithstanding Congress's sweeping statements of principle, we cannot read the plain language of § 186(a)(2), with its reference to "employees . . . who are employed," to allow the imposition of criminal liability in circumstances involving nothing more than a prospective employer's possible future hiring of union members. Of course Congress may, in its judgment, seek to amend § 186 to expand its reach. Subsection (a)(2) was added in just this way as part of the LMRDA amendments in response to a decision by a court of appeals recognizing a similar constraint on the statutory language. See Ventimiglia v. United States, 242 F.2d 620, 623 (4th Cir. 1957) ("A criminal statute is not to be stretched to cases not covered, merely because it may seem to a court that Congress would have done well to cover them."), superseded by statute, Labor-Management Reporting and Disclosure Act of 1959, Pub. L. No. 86-257, sec. 505, § 302(a)(2), 73 Stat. 519, 537 (codified as amended at 29 U.S.C. § 186(a)(2)); S. Rep. 86-187, at 13 (noting the addition of subsection (a)(2)'s language in response to Ventimiglia).

28

Furthermore, the second formulation – which would require that the union have the present intent to admit the employees – "would seem to render the 'would admit to membership' language superfluous, since section [186(a)(2)] also prohibits payments to officers of a labor organization which 'seeks to represent' a group of employees, language more suited to the 'present intention' situation than the phrase at issue here." Pecora, 798 F.2d at 622.

Having established the proper interpretation of the "would admit to membership" clause, we now have all the pieces to assemble a complete statement of the minimum proof required to sustain a conviction under § 186(a)(2). Combining all the elements, the Government was required to prove, for each Taft-Hartley count and predicate act based on § 186(a)(2), that Browne received or accepted the alleged monetary amount from the employer, and that, at the time of the alleged criminal act, the employer had employees in an industry affecting commerce whom D1-MEBA or NFOPAPE would have admitted to membership.[19] Again, for the sake of discussion here, we assume Browne's suggested definition

[19] At trial, the parties stipulated that D1-MEBA and NFOPAPE were "labor organizations," and that Browne was an "officer or employer thereof" at the relevant times, within the meaning of § 186. Furthermore, Browne did not contest his receipt of the payments alleged by the Government. Instead, he focused his defense – just as he focuses his arguments on appeal – on the circumstances of the employees whom the Government alleged would have been admitted to membership in the union at the time the payments were made. Accordingly, we narrow our discussion to that issue and assume, as Browne did, that the evidence was sufficient to satisfy the remaining elements of the Taft-Hartley crimes alleged.

29

for the term "employee" in § 186(a)(2) – that the term does not include supervisors. With that in mind, we now proceed to examine the sufficiency of the evidence for the contested Taft-Hartley count and each of the contested predicate acts.

We review de novo a district court's denial of judgment of acquittal on sufficiency of evidence grounds. United States v. Yates, 438 F.3d 1307, 1311–12 (11th Cir. 2006) (en banc). In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor.[20] United States v. Puche, 350 F.3d 1137, 1142 (11th Cir. 2003). If a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt, we will affirm the verdict. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); United States v. Drury, 396 F.3d 1303, 1312 (11th Cir. 2005). This inquiry does not require that the evidence be inconsistent with "every reasonable hypothesis except guilt." United States v. Starrett, 55 F.3d 1525, 1541 (11th Cir. 1995) (citation omitted). Because we recognize that "the jury is free to choose between or among the reasonable conclusions to be drawn

---

[20] The descriptions of the evidence that follow in this opinion reflect the requirement that we consider the evidence in the light most favorable to the Government.

from the evidence presented at trial," our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial. See id. ("In reviewing conspiracy convictions, the question is whether there is substantial evidence to support the verdicts." (quoting United States v. Russo, 796 F.2d 1443, 1455 (11th Cir. 1986))).

2.

We begin with a review of the evidence in support of the allegation that between October 1993 and July 1998, Browne accepted approximately $250,000 from Hvide. This same conduct underlies substantive Count 3 and Predicate Act 1. We find that, when construed in the light most favorable to the Government, a reasonable jury could have concluded beyond a reasonable doubt that during the relevant time period, Hvide had non-supervisory employees who would have been admitted to D1-MEBA and NFOPAPE.

Hvide was founded in 1958 by a good friend of Browne's named Hans Hvide, and had three divisions: a towing division that provided tug services for several ports in the southeastern United States, an offshore energy support division that provided support services for offshore oil drilling, and a tanker division that transported petroleum and chemicals up the east and west coasts of the United States. By the time Hvide went public in 1996, it had expanded its operations to a

31

worldwide marine services company employing over 3,000 workers. Hvide employees comprised the crew of the towing and tanker divisions.

Even assuming that a portion of the licensed seamen would qualify as supervisors for collective bargaining purposes, and thus be excluded from Browne's definition of "employees," a reasonable jury could conclude that D1-MEBA and NFOPAPE would have admitted to membership the remaining licensed seamen, unlicensed seamen, and land-based support staff in Hvide's employ. The Government adduced testimony that the life blood of the unions was recruitment; active unionization of new members replaced retiring workers, increased the available job base, and ensured the survival of unions. Indeed, at NFOPAPE's inception, Browne "wanted to be able to organize anybody and everybody in the private sector," both in state and out of state. Accordingly, the division bylaws of the Federation of Private Employees were broadly drafted without any restrictions on the types of workers who could be admitted to NFOPAPE: Article I, section 4(f) named as its object "[t]o bring within its membership ranks any and all employees of employers within the scope of this organization's jurisdiction."

There is no question that Hvide's shipboard crew members were precisely the type of workers that were already organized in D1-MEBA's maritime

32

divisions, and Hvide's land-based support employees were of the type that were already organized in POID. As for whether NFOPAPE would have organized maritime workers, the Government introduced "pledge cards"[21] for two proposed divisions of NFOPAPE that would have organized seamen, the United Seafarers of America and the Nautical Workers of America.

Negotiations concerning Hvide's double-hull tanker project provide further support that D1-MEBA and NFOPAPE would have sought to organize Hvide's employees. In 1995, Hvide entered into a venture to build state-of-the-art double-hull oil tankers.[22] Based on certain financing restrictions, Hvide and its partners were required to obtain an agreement with a labor organization to crew the new tankers. In 1995, Hvide approached Browne to request his assistance in securing such a labor agreement. Browne in turn spoke with D1-MEBA officials, and in early December 1995, union officials invited Hvide to the Washington, D.C. headquarters to discuss having union members crew the new tankers from top to bottom. On December 4, Alexander Shandrowsky was elected as the new

---

[21] A pledge card is a document signed by an employee indicating that he wishes a given union to represent him for collective bargaining purposes, and it represents the first step in unionizing employees of a given employer.

[22] Following the Exxon-Valdez oil spill, Congress enacted the Oil Pollution Act of 1990 to prevent the accidental discharge of oil by phasing out single hulls in favor of double hulls for oil tankers. See 46 U.S.C. § 3703a.

president of D1-MEBA. Despite Browne's encouragement, Shandrowsky refused to agree to a contract with Hvide, believing that the terms of the contract would have made it "by far and away, the worst contract" that D1-MEBA had.

Although the deal ultimately fell through, the negotiations support the finding that the employees already employed by Hvide were the very types of employees that D1-MEBA and NFOPAPE would have admitted to membership. Indeed, Hvide wanted to be able to transfer some of its employees who were crewing other Hvide ships onto the new oil tankers. Furthermore, during the negotiations, Browne discussed the possibility of organizing the unlicensed seamen aboard the oil tankers into a new, unlicensed division of NFOPAPE, to be called the United Seafarers of America. Browne went so far as to have pledge cards and division bylaws for this new division drawn up and reviewed by a NFOPAPE organizer, Ernest Rumsby, whom Browne informed would become a vice-president of that division.

Browne's principal argument with respect to the Hvide payments is that the "admit to membership" clause does not apply because Hvide's existing maritime employees were already represented by the Seabulk Officer's Association and the Seabulk Seamen's Association. Although these associations were not affiliated

with the AFL-CIO,[23] Browne argues that the "contract-bar doctrine" would have prevented D1-MEBA and NFOPAPE from representing Hvide's existing employees. The contract-bar rule precludes the filing of a petition for an election involving employees covered by a contract of no more than three-years' duration, unless the petition is filed within a certain time period prior to termination of the existing contract. See Local Union 3074, District 15, United Steel Workers v. Shore, 386 F. Supp. 600, 602 (W.D. Pa. 1974). Its purpose is "to stabilize for a reasonable term an existing contractual relationship between an employer and its employees' bargaining representative." See N.L.R.B. v. Arthur Sarnow Candy Co., 40 F.3d 552, 557 (2d Cir. 1994) (quoting Corallo v. Merrick Cent. Carburetor, Inc., 733 F.2d 248, 252 (2d Cir. 1984)). In other words, Browne asserts that the unions would not have sought to represent Hvide's employees because they could not. The Government responds that the Seabulk Officer's Association and the Seabulk Seamen's Association were merely in-house associations of Hvide (Hvide was later renamed Seabulk International Inc.), and that such informal agreements would have presented no true impediment to organization.

---

[23] Article 20 of the AFL-CIO constitution prohibits the raiding of one affiliated union by another.

Construing the facts in the light most favorable to the Government, it was reasonable for the jury to find that the existence of these agreements would not have prevented D1-MEBA and NFOPAPE from seeking to organize Hvide's employees. As the Pecora court observed, "the existence of possible roadblocks" in the form of "practical or legal impediments to the actual organization of a group of workers" does not conclusively render § 186(a)(2) inapplicable. See Pecora, 798 F.2d at 623. Even if the contract bar were otherwise applicable, the contract-bar doctrine would not have prevented the operation of § 186(a)(2) in this case. In the first place, the contract bar is a creation of the National Labor Relations Board; it has no source in any express language of the National Labor Relations Act. Pecora, 798 F.2d at 621 n.3; Local 1545, United Brotherhood of Carpenters and Joiners of America, AFL-CIO v. Vincent, 286 F.2d 127, 130 (2d Cir. 1960). Accordingly, the three-year period is not an inflexible bar; it remains a policy "[w]hich the Board in its discretion may apply or waive as the facts of a given case may demand in the interest of stability and fairness in collective bargaining agreements." Vincent, 286 F.2d at 131 (quoting N.L.R.B. v. Grace Co., 184 F.2d 126, 129 (8th Cir. 1950)).

Second, and more importantly, an "agreement constitutes a bar to the holding of a representation election for the life of the agreement, up to a maximum

36

of three years." Arthur Sarnow Candy Co., 40 F.3d at 557 (emphasis added).

After three years have elapsed, "insurgent unions can challenge incumbents for jurisdiction." Pecora, 798 F.2d at 621 n.3. Thus, Hvide's agreements could not have raised an insurmountable bar to the organization of Hvide's employees by D1-MEBA and NFOPAPE for the entire period that Browne was accepting payments from Hvide, namely, October 1993 to July 1998. See id. ("It is implausible that the contract bar could have prevented Local 863 from asserting its jurisdiction during the entire decade that the scheme was in operation.").

A reasonable jury could have concluded that D1-MEBA and NFOPAPE would have sought to organize Hvide's existing employees despite the presence of practical or legal roadblocks to actual organization. Having so decided, a reasonable jury could also conclude beyond a reasonable doubt that Browne violated the Taft-Hartley Act when he accepted payments from Hvide. Thus, we affirm the district court's denial of the motion for judgment of acquittal on Count 3/Predicate Act 1.

## B.

Having determined that Browne's conviction on the Taft-Hartley violation embodied in Count 3 and Predicate Act 1 must stand, we now turn our attention to his sufficiency of evidence challenge on the remaining Taft-Hartley predicate acts

and other substantive counts of the indictment. As with the Hvide-related charges, Browne moved for entry of judgment of acquittal on the Taft-Hartley violations alleged in Predicate Acts 2 and 4 of Count 2, claiming that the Government had adduced insufficient evidence. Similar to the Hvide charges, Predicate Acts 2 and 4 each alleged that Browne received money from a different employer whose employees either D1-MEBA or NFOPAPE would admit to membership. The jury ultimately found that Browne committed both these acts, and the district court denied the motion for judgment of acquittal.

Browne asserts that the district court erred in submitting Predicate Acts 2 and 4 to the jury, and that ultimately this error taints his convictions for RICO conspiracy, Count 1, the substantive RICO violation, Count 2, and honest services mail fraud, Count 7.

1.

Browne's argument is layered, so we must disassemble it before we can engage in any analysis. For ease of discussion here, we take the substantive RICO violation as our starting point. As relevant here, RICO generally prohibits a person who is affiliated with a broadly defined "enterprise" from conducting that enterprise's affairs through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). In support of this count, the Government was required to prove: (1)

38

that an enterprise existed; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either directly or indirectly, in the conduct of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity. United States v. Starrett, 55 F.3d 1525, 1541 (11th Cir. 1995). We are concerned here with the fifth element – the "pattern of racketeering activity" – which, at the threshold, requires proof that Browne committed at least two predicate racketeering acts. 18 U.S.C. §§ 1961(1), 1962(c); see also Starrett, 55 F.3d at 1541.

The Government alleged a total of fifteen predicate acts in the second superseding indictment, twelve of which were charged against Browne. The jury indicated its findings of "Committed" or "Not Committed" for each defendant on each alleged predicate act by responding to a special verdict form. In total, the jury found that Browne committed five of the twelve predicate acts charged against him in Count 2. Two of these – Predicate Acts 13 and 14 – alleged mail fraud violations, and Browne does not contest the jury's findings on these acts. The remaining three predicate acts found by the jury were those alleging violations of the Taft-Hartley Act: Predicate Acts 1 (pertaining to Hvide), 2 (pertaining to Coastal Gaming), and 4 (pertaining to Coleary Transport). We have already

rejected Browne's challenge to Predicate Act 1, so only acts 2 and 4 remain in dispute. We conclude that an examination of the sufficiency of evidence on these two predicate acts is unnecessary to the disposition of this appeal. As we will explain, even if Browne were correct and he were entitled to reversal of the jury's findings on Predicate Acts 2 and 4, such an outcome would not affect any of the substantive counts of the indictment on which he was found guilty.[24]

With regard to the substantive RICO charge, Count 2, Browne does not challenge the jury's findings on the mail fraud predicate acts (13 and 14), so his argument does not rest on any suggestion that the Government failed to prove at least two predicate acts as required by § 1961(5), even if we assume that Acts 2 and 4 are invalid as he contends. Instead, Browne focuses on the sufficiency of the evidence to establish part of the fifth element of § 1962(c).

To establish the fifth element under § 1962, the Government must prove two components: the predicate acts must relate to the enterprise charged, which we have referred to as the "relationship component," see Starrett, 53 F.3d at 1546; and "the predicate acts must actually form a pattern, i.e., relate to each other and have continuity," United States v. To, 144 F.3d 737, 747 (11th Cir. 1998); see H.J., Inc.

---

[24] Browne does not challenge his sentences in this appeal, so we have no occasion to consider whether or to what extent a reversal of the jury's findings on Predicate Acts 2 and 4 would affect his sentencing.

v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989) (holding that the Government must prove not only that at least two predicate acts were committed, but also "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity"), which we have called the "pattern component." Starrett, 53 F.3d at 1546–47. As we have elaborated the former part of the pattern component, the predicate acts must relate to each other (as distinguished from the relationship component), meaning that the predicate acts must "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and . . . not [be] isolated events." See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14, 105 S. Ct. 3275, 3285 n.14, 87 L. Ed. 2d 346 (1985) (quoting Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575(e)). It is the latter part of the pattern component – continuity – that Browne contests in this appeal, so we confine our discussion accordingly.

We will say more about continuity below, but first we summarize the parties' arguments. Browne suggests that, because of "the centrality of the Taft-Hartley charges to the government's case," this court "should not 'hazard a guess'" as to whether the jury would have found the required continuity to satisfy the pattern component solely on the basis of the mail fraud acts alleged in

41

Predicate Acts 13 and 14. In support of his argument, Browne relies heavily on the decision of the Second Circuit in United States v. Delano, 55 F.3d 720 (2d Cir. 1995). In that case, the jury issued a special verdict, finding that the defendant had committed five RICO predicate acts and convicting him on one substantive RICO count and one count of RICO conspiracy. Delano, 55 F.3d at 725. The defendant moved for judgment of acquittal, which was denied. Id. On appeal, the court vacated the jury's findings on three of the five predicate acts, holding that the evidence was insufficient. Id. at 727. The other two predicate acts remained undisturbed, and, in considering what effect its holding would have on the RICO counts, the court acknowledged that, "for the purposes of our review, [the defendant] engaged in . . . a pattern of racketeering that included at least two predicate acts." Id. at 728. Nevertheless, the court reversed the RICO counts and remanded for a new trial. Id. at 729. The court reasoned that "it would be too speculative to assume" that the jury would have found relatedness and continuity on the basis of the two remaining predicate acts alone, noting that "the proof concerning [the invalid predicate acts] represented the bulk of this RICO prosecution, eclipsing all else." Id. at 728–29. Here, Browne urges this court to adopt Delano's reasoning. He suggests that because we cannot know what evidence the jury relied on to find that he had undertaken a continuous pattern of

42

racketeering acts, we must reverse the substantive RICO conviction.

Our resolution of this issue is not as simple as the Government at first suggests in its response. For its primary argument in support of the substantive RICO conviction, the Government cites precedent of this circuit as determinative for the proposition that a RICO conviction will survive appeal whenever at least two valid predicate acts remain, regardless of whether other predicate acts are invalidated. See United States v. Peacock, 654 F.2d 339, 348 (5th Cir. Aug. 1981) ("[C]onviction under § 1962(c) requires only that the defendant be convicted of two acts of racketeering and that the [acts] must be related to the affairs of the enterprise . . . ." (internal quotation marks and citation omitted)), vacated in part on other grounds on reh'g, 686 F.2d 356 (5th Cir. Unit B 1982);[25] see also United States v. Pepe, 747 F.2d 632, 668 (11th Cir. 1984) ("[T]he government proved at least two predicate acts of racketeering beyond a reasonable doubt. This is all the government had to prove to establish a RICO pattern of racketeering and substantive RICO liability."). However, these cases simply do not address the continuity requirement of the pattern component.

That the two decisions omitted any discussion of continuity is unsurprising,

_____

[25] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

43

as both were decided before the Supreme Court pronounced definitively that continuity and relatedness are necessary components of a pattern under § 1962. See H.J., Inc., 492 U.S. at 239, 109 S. Ct. at 2900. Peacock and Pepe were decided during a simpler time for the Government in RICO prosecutions, before the statute was complicated by such abstractions as "continuity." Thus, Peacock and Pepe do not address, much less decide, the continuity issue here.

Moreover, the Government is fully aware of the requirements under H.J., Inc. that predicate acts must be related to one other and must be continuous – it even discussed them extensively in its alternative argument supporting the RICO conviction. See 492 U.S. at 239, 109 S. Ct. at 2900 ("[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related . . . ."); id. at 238, 109 S. Ct. at 2900 ("Section 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved."); cf. United States v. Alexander, 888 F.2d 777, 778 (11th Cir. 1989) (considering anew, on remand from the Supreme Court for consideration in light of H.J., Inc., whether two predicate acts were sufficiently continuous and related to establish a pattern where other predicate acts had been invalidated on appeal), on remand from 492 U.S. 915, 109 S. Ct. 3236, 106 L. Ed.

44

2d 584 (1989). Furthermore, "[it] is by now well established that in order to prove a 'pattern of racketeering activity' it is not sufficient to simply establish two isolated predicate acts." Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004). Thus, Peacock and Pepe are irrelevant to our discussion here.

Continuity of racketeering activity may be proven "in a variety of ways," "depend[ing] on the specific facts of each case." H.J., Inc., 492 U.S. at 241–42, 109 S. Ct. at 2902. In spite of the case-specific nature of the continuity inquiry, certain general principles guide the analysis. Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241, 109 S. Ct. at 2902. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." Id. at 242, 109 S. Ct. at 2902. Predicate acts "extending over a few weeks or months and threatening no future criminal conduct" do not suffice. See id. at 242, 109 S. Ct. at 2902; Jackson v. BellSouth Telecomms., 372 F.3d at 1265–66.

By contrast, the "open-ended" theory of continuity relies not on a closed set of repeated prior acts committed over a substantial period of time, but instead on the "threat of continuity" extending into the future. See Jackson v. BellSouth

45

Telecomms., 372 F.3d at 1265. The burden under this theory can be met by proof that (1) the "racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or (2) the predicate offenses are "part of an ongoing entity's regular way of doing business," including where "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." See H.J., Inc., 492 U.S. at 242–43, 109 S. Ct. at 2902; Jackson v. BellSouth Telecomms., 372 F.3d at 1265. Unlike under the "closed period" theory, continuity may be established under the "open-ended" theory "[t]hough the number of related predicates involved may be small and they may occur close together in time." H.J., Inc., 492 U.S. at 242, 109 S. Ct. at 2902; see also To, 144 F.3d at 747 (affirming RICO substantive and conspiracy convictions where the evidence was sufficient to show that the defendant committed three predicate acts, all within a span of several hours).

Given that the jury returned a guilty verdict on the substantive RICO count, we know it must have found continuity in the pattern of racketeering activity. The instruction given to the jury on that count mirrored the Eleventh Circuit pattern instruction, which we have previously held to be sufficient on the issue of continuity, United States v. Kotvas, 941 F.2d 1141, 1144 (11th Cir. 1991), and Browne does not contest the instruction here. Because the special verdict form did

46

not require any specific findings on continuity, however, Browne argues that we would be blindly guessing what the jury relied upon in making its finding. But neither our inquiry on appellate review, nor the district court's task in considering a motion for judgment of acquittal, requires us to determine the specific underlying basis of the jury's finding on continuity.

Browne's continuity argument goes astray in its focus on the jury outcomes regarding individual predicate acts. Any two predicate acts can be sufficient for the jury to find continuity. See Starrett, 55 F.3d at 1545 ("[I]f any two of Nolan's thirty-four predicate acts establish the required RICO elements, then Nolan's RICO conviction is due to be affirmed."); United States v. Church, 955 F.2d 688, 694 (11th Cir. 1992) (rejecting a sufficiency of evidence challenge where exactly two predicate acts were available to support the continuity requirement); Alexander, 888 F.2d at 778 (same); cf. 18 U.S.C. § 1961(5) ("'[P]attern of racketeering activity' requires at least two acts . . . ."). Of course the jury may find, in a given case, that the Government has proven more than two predicate acts, and the jury in such a case may rely on all the proven predicate acts to find continuity sufficient to establish a pattern. The same jury theoretically might also, consistent with the minimum requirements of the statute and H.J., Inc., find that multiple predicate acts were proven beyond a reasonable doubt, go on to find

unanimously that the evidence proving just two of the acts also fulfills the continuity requirement, and stop its inquiry there. In this latter scenario, the jury has not considered whether every proven predicate act supports a finding of continuity, but nothing further is required so long as at least two acts fulfill the requirement. In most, if not all, cases, the jury will have no occasion to explain the specific basis for its finding of continuity. Even in the instant case, in which the jury made specific findings on each predicate act via a special verdict form, the finding of continuity can only be inferred from the eventual guilty verdict on Count 2 issued by a properly instructed jury. The jury's decisions on individual predicate acts indicate nothing about its finding of continuity. In this regard, the jury's finding of continuity is, with regard to that limited issue, much like a general verdict. The jury may have relied on any two of the proven predicate acts, or more, in finding continuity, but it will not have indicated which specific acts formed the basis for its decision.

In such situations, our analysis is guided by Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991). Griffin involved a conspiracy charge alleging two factually distinct objects of the conspiracy in the same count of the indictment. Id. at 47, 112 S. Ct. at 468. At trial, the evidence against Griffin only connected her to one of the two alleged objects, but the jury convicted

her of the conspiracy count by general verdict after being instructed that it could find guilt upon proof of either object. Id. at 47–48, 112 S. Ct. at 468. The Supreme Court affirmed the conviction, noting the rule at common law that "a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds – even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." Id. at 49, 112 S. Ct. at 469. The Court distinguished prior decisions reversing general verdicts on counts based on alternate grounds when one of the possible grounds was later revealed to be either constitutionally or legally flawed, as opposed to being "merely unsupported by sufficient evidence." Id. at 56, 112 S. Ct. at 472. In the latter type of case, "the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Id. at 56–57, 112 S. Ct. at 473 (citation omitted). Although a jury, in its limited role as factfinder, cannot be trusted to identify and discount "a legally insufficient theory" as a basis for a verdict, "[q]uite the opposite is true . . . when [jurors] have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence" and are presumed not to rely upon theories that are not adequately proven. Id. at 59–60, 112 S. Ct. at 474.

We have never applied Griffin in this particular RICO context, but we see

49

no reason why its rationale does not apply here.  See United States v. Vastola, 989 F.2d 1318, 1330 (3d Cir. 1993) (holding, in a similar RICO case, that "[t]he rationale of Griffin directly applies").  Browne challenges the jury's ultimate finding of continuity under the substantive RICO count on the basis of the presumptive evidentiary insufficiency of certain predicate acts and the court's inability to determine whether the jury relied on any of those factually insufficient predicate acts.  But because any combination of two factually sufficient predicate acts can support a finding of continuity, that finding – and thus the substantive RICO conviction – may stand "if the evidence is sufficient with respect to any [two] of the acts charged."  See Griffin, 502 U.S. at 56–57, 112 S. Ct. at 473. Reversal of either a jury's finding of continuity or a conviction on a substantive RICO count is not required simply because some predicate acts are factually insufficient, as long as there remain at least two adequately proven acts.

This rule takes further support from the notion that courts must be cognizant not to impinge upon the jury's factfinding role when reviewing the sufficiency of evidence.  The nature of the review recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," preserving that role "through a legal conclusion that upon judicial review all of the evidence is to be

50

considered in the light most favorable to the prosecution." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Ultimately, then, our review for sufficiency of the evidence "is of course wholly unrelated to the question of how rationally the verdict was actually reached. . . . [I]t does not require scrutiny of the reasoning process actually used by the factfinder – if known." Id. at 319 n.13, 99 S. Ct. at 2789 n.13; cf. Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851, 868–69, 113 L. Ed. 2d 808 (1995) (observing that, under Jackson v. Virginia, review for sufficiency of the evidence requires not "what reasonable triers of fact are likely to do," but "whether the trier of fact has power to make a finding of guilt . . . as a matter of law . . . . [T]he mere existence of sufficient evidence to convict would be determinative . . . ."). Sufficiency review operates as a backstop to protect the defendant's due process rights, not as a license for the court to second-guess the jury. See Jackson v. Va., 443 U.S. at 319, 99 S. Ct. at 2789. Upon a sufficiency challenge, the court must determine only whether, on the basis of the proof adduced by the Government, a jury could rationally have reached a verdict of guilty beyond a reasonable doubt. Whether the jury actually chose an available, rational result over an irrational alternative is ultimately beyond the court's power to police, but we presume that juries do not make irrational choices when presented with options supported by evidence. See

id. at 319 n.13, 99 S. Ct. at 2789 n.13.

In light of these principles, we cannot accept Browne's suggestion that we adopt the reasoning of the Second Circuit in Delano. That case is unpersuasive because it would require unwarranted speculation into the jury's decisionmaking. The court states that it must decide whether, without the invalidated predicate acts, "the jury nonetheless would have found that Delano committed . . . a pattern of racketeering activity." Delano, 55 F.3d at 728 (emphasis added). We disagree with that premise; as Jackson makes clear, the question should be whether a rational jury could have found that the pattern requirements were met. See 443 U.S. at 319 n.13, 99 S. Ct. at 2789 n.13. Neither Delano, nor the sole case on which it relies, United States v. Biaggi, 909 F.2d 662, 692–93 (2d Cir. 1990), provides any authority for the proposition that a court must reverse a RICO conviction whenever the jury might (or might not) have based its pattern finding on predicate acts later determined to be insufficient. See United States v. Edwards, 303 F.3d 606, 642 (5th Cir. 2002). In any event, Delano's holding applies, at most, to cases in which the invalidated predicate acts dominate the RICO prosecution. See United States v. Dhinsa, 243 F.3d 635, 670 (2d Cir. 2001). Instead, we favor the approach of the Third Circuit in United States v. Vastola, where the court rejected "speculations about the jury's rational deliberation

process" and independently determined that there was sufficient evidence of at least two predicate acts to support a substantive RICO conviction, even though it was impossible to determine from the verdict whether the jury actually found more than one predicate act. 989 F.2d at 1331.

Upon our independent review, we have no trouble concluding that the Government adduced sufficient evidence for a rational jury to find continuity among at least two predicate acts. Predicate Act 1 was based upon evidence that from 1993 through 1998, Browne accepted $254,000 from Hvide while also employed by D1-MEBA and NFOPAPE. Pursuant to a written "consultation" agreement that was charged to the Port Everglades Towing division of Hvide, Browne was compensated for his consulting work at the rate of $1,500 per month from October 1993 through January 1994, and $2,000 per month thereafter. Browne's retainer was raised to $3,500 per month in March 1994 and to $5,000 per month in May 1994. He continued to receive $5,000 per month until January 1997, when his retainer was lowered to $4,000 per month. His contract was terminated in October 1998 as a result of the Government's criminal investigation.

Predicate Act 13 charged Browne with mail fraud. In 1995, a Florida state legislator, Ron Greenstein, sought Browne's advice in assisting a vision insurance company in its proposal to cover local government employees. The proposed

vision plan had nothing to do with union business. The Government introduced vouchers that Browne, or others at his direction, submitted expense vouchers for the reimbursement of expensive meals and airplane tickets purchased in November 1995, January 1996, and February 1996. These expenses related to Greenstein's proposed vision plan, not to union business.

Predicate Act 14 also concerned mail fraud. The Government adduced evidence that Browne frequently submitted vouchers prepared by himself or Devaney for the reimbursement of meals with family or friends that were unrelated to union business, or that he submitted vouchers for reimbursement of meals that had been paid for by union employees at his direction. The dates of the vouchers for which Browne was found guilty of mail fraud spanned six years: July 8, 1993; October 27, 1993; March 25, 1994; May 2, 1994; August 13, 1994; January 7, 1996; June 17, 1996; June 18, 1996; October 19, 1996; December 31, 1996; July 7, 1997; November 28, 1997; and December 3, 1997.

Predicate Acts 1, 13, and 14 satisfy the continuity requirement of the pattern component. We have previously affirmed a district court's dismissal of a plaintiff's substantive racketeering claims where the alleged racketeering activities pertained to the settlement of a single lawsuit, not a series of lawsuits, over a nine-month period of time. Jackson v. BellSouth Telecomms., 372 F.3d at 1267

(affirming dismissal "[i]n view of the narrow scope of the alleged racketeering activity and the limited time frame in which it is said to have taken place"). Unlike that case, Predicate Acts 1, 13, and 14 constitute a "series of related predicates extending over a substantial period of time" – namely, from 1993 to 1998 – and thus satisfy closed-ended continuity. See H.J. Inc., 492 U.S. at 242, 109 S. Ct. at 2902. The acts also establish a sufficient threat of repetition to support open-ended continuity. That is, rather than pointing to a "unique, first-time occurrence," the acts were part of the defendants' "regular way of doing business." See id. at 1268. We therefore find that the Government's evidence was sufficient to establish continuity for purposes of the pattern component.

2.

Browne similarly argues that his conviction for the RICO conspiracy count, Count 1, must be reversed because the jury's conspiracy verdict did not identify the acts upon which was the conviction was based. Accordingly, he contends, the jury may have relied upon the Taft-Hartley charges in convicting him. As we have declined to adopt the reasoning of Delano, and we find sufficient evidence in the trial record that supports the Count 1 conviction, even assuming that Predicate Acts 2 and 4 of Count 2 fail, we affirm Browne's conviction.

Because there are fewer proof requirements under § 1962(d) than under the

substantive RICO offenses – most notably, through the absence of the requirement of an overt act – the conspiracy offense reaches a wider range of conduct.  See United States v. Harriston, 329 F.3d 779, 785 (11th Cir. 2003).  A defendant may be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations of §§ 1962(a), (b), or (c).  United States v. Alonso, 740 F.2d 862, 871–72 (11th Cir. 1984).  The touchstone of liability is an agreement to participate in a RICO conspiracy, which may be shown in two ways: (1) showing an agreement on the overall objective of the conspiracy, or (2) showing that a defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a "single objective."  United States v. Abbell, 271 F.3d 1286, 1299 (11th Cir. 2001).  "If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts."  Id.  In the absence of direct evidence of an agreement on an overall objective, the Government may prove such an agreement through "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme," United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (internal quotation marks and citation omitted), amounting to evidence that each defendant necessarily must have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering.  United States v. Castro, 89

56

F.3d 1443, 1451 (11th Cir. 1996).

Browne asserts that the Government's case was not based on an agreement on an "overall objective," but instead focused on proving an agreement to commit personally two predicate acts, as to which the evidence is insufficient. The Government responds that the evidence is sufficient to sustain Browne's conviction under either theory. Because we find that the Government presented sufficient circumstantial evidence that Browne agreed to the overall objective of the enterprise – i.e., to control the financial affairs of the union and misuse its assets and influence for personal gain – we do not reach the question whether the evidence was sufficient to convict Browne based on a "single objective" theory.

Browne was executive director of D1-MEBA, president of NFOPAPE, and divisional director of the Federation of Public Employees. While serving in those positions, Browne placed his sister, Devaney, in charge of handling division finances at D1-MEBA/FOPE and made her the de facto secretary/treasurer of NFOPAPE and the Federation of Public Employees. Devaney processed the expense vouchers submitted by Browne and others at Browne's direction, which claimed reimbursement for non-union expenses and contained other false information. Many of these expenditures were without supporting documentation, as required under the LMRDA. Devaney also purchased airplane tickets for

57

personal trips to New York City that she charged to Browne's union credit card.

In 1995, NFOPAPE organizer Rumsby twice asked Browne for permission to organize the employees of Paramount Vending Company. Browne instructed him not to "mess with this company," because they were a "friend or a friend of a friend." In addition, from 1993 to 1998, Browne accepted $254,000 from Hvide, an employer whose employees D1-MEBA and NFOPAPE would have admitted to membership. For his receipt of that money, Browne was required to submit to the Office of Labor Management Standards a Labor Organization Officer and Employee Report, or LM-30, a public document reporting the receipt of anything of value from an employer.[26] In addition, local ordinance required Browne to file lobbying registration forms and annual expenditure statements.[27] Browne failed to file either the LM-30 forms or the required lobbying forms with respect to the money he received from Hvide.

Testimony also demonstrated how Browne concealed the affairs of the enterprise from discovery. In 1996, Browne refused to permit D1-MEBA officials to audit the books and records of NFOPAPE, even when he knew it would lead to

---

[26] See 29 U.S.C. § 432; 29 C.F.R. § 404.3.

[27] Section 1-262 of the Broward County Code then in effect required any person communicating directly with any county commissioner for the purpose of influencing legislation to file registration forms with the county administrator, as well as an annual statement listing all lobbying expenditures and the sources that funded such expenditures.

the loss of his position at D1-MEBA/FOPE. In addition, Browne did nothing in response to Carrillo's suspicions that Devaney was improperly handling the union's finances. Browne and Devaney together deflected Zakaib's requests for access to the union's books and records, and disregarded the financial advice of NFOPAPE's accountants to establish internal controls over the accounting functions of the union. In 1999, Browne failed to take prompt measures upon learning of Devaney's payroll theft from Lambert, and the embezzlement continued for an additional six months. A jury could infer from these facts that there was an agreement on the overall objective charged in the indictment. Accordingly, we affirm Browne's conviction on Count 1.

3.

Browne's final sufficiency challenge contends that there was insufficient evidence to support his conviction for honest services mail fraud, Count 7. Browne raises no specific challenges to his conviction. Instead, he argues more broadly that, because the evidence does not support the three Taft-Hartley predicate acts of which he was convicted, the evidence is insufficient to support Count 7. To the extent that we have already rejected Browne's challenge to Count 3/Predicate Act 1, Browne's argument fails on its own terms. More fundamentally, however, Browne's efforts to portray Count 7 as merely a

"kitchen-sink" approach to capturing the conduct underlying the Taft-Hartley counts is misguided. Honest services mail fraud constitutes a crime that is distinct from a violation of the Taft-Hartley Act, and reaches conduct that is not necessarily a violation of the Taft-Hartley Act. Here, we have little difficulty concluding that the evidence adduced at trial was sufficient for a reasonable jury to convict Browne of honest services mail fraud.

Count 7 alleged use of the mails in furtherance of a scheme to defraud D1-MEBA and NFOPAPE of Browne's honest services. To prove "honest services" mail fraud, the Government must show that the accused intentionally participated in a scheme or artifice to deprive the persons or entity to which the defendant owed a fiduciary duty of the intangible right of honest services, and used the United States mails to carry out that scheme or artifice. See 18 U.S.C. § 1346 (predicating a mail fraud prosecution on a "scheme or artifice to deprive another of the intangible right of honest services"); United States v. Hooshmand, 931 F.2d 725, 731 (11th Cir.1991) (defining elements of mail fraud). We have also held that a defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation may constitute a violation of the mail fraud statute where the defendant had a duty, explicit or implicit, to disclose material information. United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995).

Federal law imposes fiduciary responsibility upon labor union officials. United States v. Rodrigues, No. 03-10549, 2007 U.S. App. LEXIS 13940, at *6 (9th Cir. June 11, 2007) (mem.); United States v. Boffa, 688 F.2d 919, 930–31 (3d Cir. 1982) ("[T]he LMDRA [sic] established, as a matter of federal law, union members' right to the honest and faithful services of union officials."). Contrary to the Taft Hartley Act's focus upon a union official's receipt of money or a thing of value from an employer, § 501(a) of the Labor Management Reporting and Disclosure Act "imposes fiduciary responsibility in its broadest sense, and is not confined to financial dealings by union official"; union members are owed "the loyal, faithful, and honest services of their union official." See Boffa, 688 F.2d at 930–31. Specifically, § 501(a) includes, inter alia, the requirements that a union official must refrain from dealing with the labor organization as an adverse party, and must account to the labor organization for certain profits received by him.[28]

---

[28] In pertinent part, 29 U.S.C. § 501(a) provides that:
The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. . . .

61

There was sufficient evidence at trial to establish the elements of the crime. Contrary to Browne's claim that there was insufficient evidence of conduct on which honest services mail fraud could be based, a reasonable jury could have concluded beyond a reasonable doubt that Browne violated his fiduciary duties to the union and its members based on evidence that Browne received monetary payments through the United States mails from Hvide, whose employees D1-MEBA and NFOPAPE would have admitted to membership; failed to disclose such payments to the union and on LM-30 forms; and failed to file lobbying registration statements in Broward County. We have already rejected Browne's argument that <u>Delano</u> requires reversal based on the theoretical possibility that the jury may have relied on Predicate Acts 2 (pertaining to Coastal Gaming) and 4 (pertaining to Coleary Transport) of Count 2 in convicting Browne of Count 7. Because Browne raises no further challenges, we affirm Browne's conviction of honest services mail fraud.

C.

Having determined that Browne's sufficiency challenges fail, we turn to his challenge to the jury instruction. He claims that the district court should have charged the jury on the exclusion of supervisors from the term "employees" under the statute. In his proposed instructions, Browne proposed a one-sentence

addition to the court's proposed instruction on the elements of the Taft-Hartley

counts. The sentence would have simply stated that "employees" do not include

supervisors. At the charge conference, Browne against requested this instruction

and was denied. Browne argues that the refusal infected Count 3/Predicate Act 1

(pertaining to Hvide) and Predicate Act 2 (pertaining to Coastal Gaming). As we

have already explained supra, reversal of the jury's findings on Predicate Act 2

would not affect any of the substantive counts of the indictment on which Browne

was convicted; thus, we are concerned only with Count 3/Predicate Act 1.

We review jury instructions de novo to determine whether they misstate the

law or mislead the jury to the objecting party's prejudice. United States v.

Hansen, 262 F.3d 1217, 1248 (11th Cir. 2001) (per curiam). If the instructions

accurately state the law, the trial judge has wide discretion to determine their style

and wording. United States v. Kenney, 185 F.3d 1217, 1222–23 (11th Cir. 1999)

(per curiam).[29]

---

[29] The parties' briefs state that Browne's challenge to the district court's jury instruction is subject to abuse-of-discretion review. We disagree. Browne did not propose a proper theory-of-defense instruction, but instead proposed an addition to the court's instruction on the elements that would have excluded supervisors from the definition of "employees." The court otherwise gave no instruction defining the term. This is more akin to a failure by the district court to instruct on one element of an offense than a failure to explain a specific defense theory, and is therefore subject to de novo review.

Even if we were to apply the abuse-of-discretion standard, however, it would not alter the outcome. Our circuit uniformly finds an abuse of discretion where a district court "applies an incorrect legal standard [or] follows improper procedures in making the determination." Burr & Forman v. Blair, 470 F.3d 1019, 1030 n.31 (11th Cir. 2006); Klay v. Humana, Inc., 382 F.3d

Again assuming that Browne correctly asserts that the supervisory exclusion applies to § 186, it follows that the district court erred in declining to advise the jury of that definition and that Browne's proposed jury charge accurately recited the law. It does not automatically follow, however, that the district court's failure constituted reversible error. A district court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis. See Mitchell v. Esparza, 540 U.S. 12, 16, 124 S. Ct. 7,10, 157 L. Ed. 2d 263 (2003); Neder v. United States, 527 U.S. 1, 9, 119 S. Ct. 1827, 1833 144 L. Ed. 2d 35 (1999) ("[A]n instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."). The correct focus of harmless-error analysis is whether it is clear

1241, 1251 (11th Cir. 2004); Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001) (per curiam). In other words, as articulated by the Supreme Court, "[a] district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L. Ed. 2d 392 (1996), superseded by statute on other grounds as noted in United States v. Mandhai, 375 F.3d 1243, 1249 (11th Cir. 2004); id. ("The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."); see Young v. New Process Steel, LP, 419 F.3d 1201, 1203 (11th Cir. 2005) ("[The] limited standard [of abuse of discretion] does not mean much in this case, which turns on a pure law issue . . . . We decide pure law issues de novo, which is another way of saying that a ruling based on an error of law is an abuse of discretion." (citations omitted)). We therefore follow the Supreme Court's lead in determining that "[l]ittle turns . . . on whether we label review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction." Koon, 518 U.S. at 100, 116 S. Ct. at 2047–48; see United States v. Barner, 441 F.3d 1310, 1315 n.5 (11th Cir. 2006) ("The disagreement [over which standard of review to apply in prosecutorial vindictiveness cases] is perhaps more apparent than real, for even under an abuse of discretion standard, errors of law receive no deference.").

beyond a reasonable doubt that a rational jury would have found the defendant guilty in the absence of the error. Put another way, the focus is whether "the jury verdict would have been the same absent the error" or "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." See Neder, 527 U.S. at 17, 19, 119 S. Ct. at 1837, 1839.

It is clear beyond reasonable doubt that, even assuming the supervisory exclusion applies to § 186, the failure to instruct the jury that the definition of "employees" excludes supervisors was harmless error. With respect to the Hvide charge, the evidence adduced at trial covered a significantly broader range of employees than merely supervisors. At trial, the Government presented overwhelming evidence that not all licensed seamen are considered "supervisors" for purposes of collective bargaining; that D1-MEBA and NFOPAPE represented non-supervisory employees; and that Hvide employed both licensed and unlicensed seamen on its existing ships and also employed workers in its offshore division that were of the precise type of workers that were already organized by D1-MEBA and NFOPAPE. Additional testimony established that D1-MEBA and NFOPAPE actively organize to increase their job base and ensure their survival. With or without Browne's proposed instruction, we have no reasonable doubt that the jury would have reached the same conclusion that D1-MEBA and NFOPAPE

would have sought to organize Hvide's employees, and thus conclude that even if the district court's instruction on an element of § 186(a)(2) was erroneous, any such error was harmless and does not entitle Browne to a new trial.

IV.

Browne contends that the district court erred by denying his motion, made pursuant to Federal Rule of Criminal Procedure 14, to sever his trial from that of Devaney. We disagree. It is well settled that defendants who are indicted together are usually tried together. Zafiro v. United States, 506 U.S. 534, 537–38, 113 S. Ct. 933, 937, 122 L. Ed. 2d 317 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); United States v. Magdaniel-Mora, 746 F.2d 715, 718 (11th Cir. 1984) ("To repeat the familiar, persons indicted together ordinarily should be tried together."). This is particularly true in conspiracy cases. United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); see also United States v. Beale, 921 F.2d 1412, 1428 (11th Cir. 1991) ("The general rule is that defendants charged with a common conspiracy should be tried together."). Therefore, we are generally reluctant to second-guess the district court's decision on severance. Baker, 432 F.3d at 1236. We review the district court's denial of Browne's motion to sever for abuse of discretion; to show such an abuse, Browne must discharge the "'heavy burden'" of

demonstrating 'compelling prejudice' from the joinder." United States v. Novaton, 271 F.3d 968, 989 (11th Cir. 2001) (quoting United States v. Pepe, 747 F.2d 632, 651 (11th Cir. 1984)).

In Zafiro v. United States, 506 U.S. 534, 113 S. Ct. 933, the Supreme Court set forth a two-step test to determine "whether a defendant is entitled to a new trial due to a district court's refusal to sever prior to trial or to grant a mistrial once trial has commenced." United States v. Blankenship, 382 F.3d 1110, 1122 (11th Cir. 2004). A defendant must first demonstrate that the joint trial resulted in prejudice to him; and second, must show that severance is the proper remedy for that prejudice. Id. at 1122; see also Zafiro, 506 U.S. at 538–39, 113 S. Ct. at 938 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."). Under this test, "[t]here are only two circumstances in which severance is the only permissible remedy": where there is a serious risk that a joint trial (1) "would compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence." Blankenship, 382 F. Supp. 3d at 1122–23 (quoting Zafiro, 506 U.S. at 539, 113 S. Ct. at 938.

Browne claims that severance would have permitted him to call Devaney as

67

a defense witness offering exculpatory testimony, whereas Devaney refused to testify in a joint trial. Therefore, Browne asserts that his motion for severance falls under the second category, which includes prejudice resulting "if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Zafiro, 506 U.S. at 539, 113 S. Ct. at 938.

This circuit's framework for analyzing a motion to sever based on the desire to offer the exculpatory testimony of a co-defendant is well established. The defendant must first demonstrate: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial." United States v. Cobb, 185 F.3d 1193, 1197 (11th Cir. 1999). Once the defendant makes that threshold showing, the court must then: "(1) examine the significance of the testimony in relation to the defendant's theory of the case; assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion." Baker, 432 F.3d at 1239.

We find no abuse of discretion in the district court's denials of Browne's motions for severance based on the court's application of this framework. In his first pretrial motion to sever, Browne alleged that if called to testify at a separate

68

trial, Devaney would testify that Browne did not knowingly charge personal expenses on the union credit card, never instructed or directed her to falsify expense vouchers, and never discussed the submission of false expense vouchers; that she voluntarily fabricated names on dinner vouchers as a matter of convenience; and that Browne "always assumed that she was completing these vouchers correctly." Further, Browne would only use the union cell phone and calling card to make personal calls "simply as a matter of convenience." She would also testify that she told Browne that her New York trips were related to union business, she never told him that she took her daughter, and she charged her tickets to the union credit card. Finally, she would testify that she "took every possible precaution to conceal her crimes" in order to avoid detection; that her crimes were caused by her depression, alcohol abuse, gambling addiction, and failed marriage; that she did not conspire in any manner with Browne; and that she has no evidence or reason to believe that Browne knew she was victimizing the union.

The district court adopted the magistrate judge's report and recommendation to deny the motion for severance. That report found that "the proffered testimony contains few specific exonerative facts and consists of undocumented conclusory allegations which mitigates against Browne's severance motion"; that such

69

conclusory allegations were further "subject to substantial and damaging impeachment"; and that Browne failed to produce an affidavit from Devaney attesting that she would in fact testify at a separate trial.

Six months later, Browne filed a renewed motion for severance, claiming to have cured the deficiencies by having attached an affidavit from Devaney that was entirely consistent with the description of her proffered testimony in Browne's original motion. The district court denied the motion, noting that it was "troubled by Defendant Browne's inference that the lack of an affidavit was the sole ground for the denial of his original motion. A cursory review of [the magistrate judge's] Report and Recommendation plainly reveals a number of other grounds why the motion was denied."

In his post-trial motion, Browne moved for a new trial based on these previous denials. The court renewed its prior holdings and noted further that Browne failed to show "actual, compelling prejudice" from the denial of severance because the proffered testimony "was, in fact, elicited from other witnesses at trial, such that the jury considered these allegations and rejected them."

On appeal, Browne likens Devaney's proffered testimony to that of the co-defendants in Tifford v. Wainwright, 588 F.2d 954 (5th Cir. 1979), and United States v. Cobb, 185 F.3d 1193. We disagree. Tifford was an attorney who filed a

petition for a writ of habeas corpus contending that the Florida state courts had denied him due process by refusing to sever his trial from that of his co-defendants, one of whom was his client. All had been charged in connection with a scheme to cash forged checks. Tifford, 588 F.2d at 955. Tifford asserted that his co-defendants would testify in a separate trial that he had no knowledge of the scheme. Id. at 957. The Fifth Circuit noted that the requirements for severance had been met, including the facts that prejudice resulting from the denial of Tifford's motion was "conclusively established" and that the proffered testimony was essential to rebut the prosecution's proof on the crucial issue of Tifford's knowledge of the criminal activities. Id.

Though it is difficult to discern much of the court's reasoning from its mostly conclusory per curiam opinion, Tifford does not compel a finding of abuse of discretion here. "This Court's cases addressing severance motions have often looked hard at the substance of the affidavits proffered by the co-defendant who purportedly would testify in a separate trial." Novaton, 271 F.3d at 989. "Credibility is for the jury, but the judge is not required to sever on patent fabrications. If the testimony is purely cumulative, or of negligible weight or probative value, the court is not required to sever." Byrd v. Wainwright, 428 F.2d 1017, 1021 (5th Cir. 1970). The court in Tifford was plainly satisfied with the

71

substance, exculpatory effect, and other features of the proffered testimony. Not

so with respect to Devaney's affidavit, which we agree amounts to undocumented

conclusory allegations subject to substantial and damaging impeachment.

Furthermore, we note that Devaney's testimony was in no way contrary to her own

interests; one of her goals in this appeal is "to clear her name as to the RICO

charges," which would be served by the proffered testimony that Devaney acted

entirely of her own volition and was not involved in a conspiracy with Browne.

Such testimony is "more self-exonerating than exculpatory of [Browne]," is

"completely self-serving and thus lack[s] strong credibility." Pepe, 747 F.2d at

651; see also Novaton, 271 F.3d at 990 ("[S]tatements concerning the testimony

that would become available by severing trials must be specific and exonerative,

rather than conclusory or self-serving, in order to justify severance.").[30]

---

[30] Browne also cites to United States v. DiBernardo, 880 F.2d 1216 (11th Cir. 1989), which we find unavailing. In that case, the Government appealed the decision of the district court to grant defendants a new trial based on the view that the court had erred when it severed the trial of a co-defendant. Id. at 1222. On appeal, the court found that the motion to sever was properly granted. Id. at 1229. One of the co-defendants, D'Apice, would have testified that the other defendants were not involved in a conspiracy to distribute pornography with him and that they had no knowledge of the criminal activities. Id. at 1228. Citing Tifford, the court noted the central role occupied by D'Apice's proffered testimony and that the "proposed testimony strongly indicated that D'Apice was the only person involved in certain aspects." Id. The court found no reason to disturb the evaluation of a district judge who had evaluated the proposed testimony twice and who was "clearly familiar with the relevant facts on this issue." Id. at 1229. DiBernardo thus demonstrates that the trial court's decision on a motion to sever is committed to its sound discretion, and an appellate court will generally be reluctant to second-guess that decision. DiBernardo also held only that the trial court's decision to sever "was within the trial court's discretion," id. at 1228, not that severance was the only course of action that would have

Nor does Browne's proffered testimony resemble that in <u>Cobb</u>. The court in <u>Cobb</u> noted that it was dealing with "one of those rare cases" where the defendant's need for the proffered testimony was clear. 185 F.3d at 1197. The "sole evidence" against the defendant on the charge of receiving stolen funds was the testimony of a woman who claimed to have seen the defendant receive the money. <u>Id.</u> at 1198. Cobb's proffered testimony came from the only other available person who was present, and would have directly contradicted the only evidence against Cobb. <u>Id.</u> By contrast, the Government's evidence against Browne did not hinge on the testimony of a single witness, and as the district court noted in denying Browne's post-trial motion, "the testimony Browne alleges he would have elicited from Devaney was, in fact, elicited from other witnesses at trial."

Moreover, the interests of judicial administration and economy were considerable in this case. Unlike the joint trial in <u>Cobb</u>, which "took only one day to complete," <u>id.</u> at 1199 ("Trials do not get much shorter than that, so the cost to the system of a severance in this case is minimal."), the trial of Browne and Devaney lasted approximately two months. As in <u>Novaton</u>, we find considerations

been proper in those circumstances. <u>DiBernardo</u> thus does not necessitate a finding of abuse of discretion here.

73

of judicial economy to "weigh[] heavily" against severance "in light of the substantial systemic interest in handling this complex, conspiracy case in one trial (which lasted two months)." Novaton, 271 F.3d at 990, 991.

We therefore affirm the trial court's denial of severance.

## V.

Devaney raises three challenges to her convictions. First, she argues that the Government failed to charge a proper RICO offense,[31] and that therefore, insufficient evidence supported her convictions on Counts 1 and 2. She additionally claims that Count 1 should be vacated due to the insufficiency of evidence supporting the existence of an agreement between Browne and Devaney. Third, she argues that the district court erred by refusing to modify the RICO pattern offense instruction with respect to the fourth element of Count 2. We consider these arguments in turn and conclude that they are without merit.

---

[31] The Government's argument that Devaney has waived the issue is mistaken, as Devaney's claim alleges that the indictment failed to state an offense – a claim which may be heard at any time while the case is pending – and does not merely allege a defect in the indictment. See Fed. R. Crim. P. 12(b)(3). See United States v. Panarella, 277 F.3d 678, 685 (3d Cir. 2002) (holding that "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation"). We therefore do not reach the question whether Rule 12(b)(3)'s requirement that defenses or objections based on defects in the indictment must be raised before trial is a "claim-processing rule" susceptible to forfeiture or waiver, or whether it is a jurisdictional bar. See Bowles v. Russell, __ U.S. __, 127 S. Ct. 2360, 2365, 168 L. Ed. 2d 96 (2007) (noting the "jurisdictional distinction" between procedural rules based on court-promulgated rules and those based on statutes); Eberhart v. United States, 546 U.S. 12, 19, 126 S. Ct. 403, 407, 163 L. Ed. 2d 14 (2005).

A.

Devaney argues that for purposes of 18 U.S.C. § 1962(c), the Government could not plead and prove that D1-MEBA and NFOPAPE were the "enterprise" with which the defendants were associated and the "victim" of the predicate acts of racketeering. Devaney points to certain statements in Reves v. Ernst & Young, 507 U.S. 170, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993), and National Organization of Women, Inc. v. Scheidler, 510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994), for the proposition that while 18 U.S.C. §§ 1962(a) and (b) are concerned with activities that victimize the enterprise, § 1962(c) is limited to proscribing activities that use the enterprise as a "vehicle" to bilk third parties.

Devaney's argument draws heavily from a decision of the Third Circuit, Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995). That case involved a civil RICO action brought by Jaguar automobile corporation against a Jaguar dealership and its owners for defrauding Jaguar of more than a million dollars through the submission of five years' worth of fraudulent warranty claims to Jaguar. Id. at 261. The central issue in Jaguar Cars was whether the Jaguar dealership was sufficiently distinct from its owners to satisfy the requirement that the "person" associated with the enterprise be distinct from the "enterprise" itself. Id. at 260. The court held that the distinctiveness requirement

75

was met by bringing a claim against the defendant-owners as persons conducting the dealership enterprise through a pattern of racketeering activity.  Id. at 268.  In so holding, the court noted the statement of the Reves Court that "'Congress consistently referred to subsection (c) as prohibiting the operation of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting acquisition of an enterprise.'"  Id. at 267 (quoting Reves, 507 U.S. at 182, 113 S. Ct. at 1171).  The court further observed that the Scheidler Court "held that the 'enterprise' in subsection (c) is properly viewed as the 'vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity.'"  Id. (quoting Scheidler, 510 U.S. at 259, 114 S. Ct. at 804).  The Third Circuit thus concluded:

> [A] victim corporation 'drained of its own money' by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their racketeering activity.  Rather, in such an instance, the proper enterprise would be the association of employees who are victimizing the corporation, while the victim corporation would not be the enterprise, but instead the § 1962(c) claimant.

Id.

We find this dictum in Jaguar Cars to be unpersuasive.[32]  Like the district

---

[32] Apparently, at least one court within the Third Circuit has chosen to disregard the dictum.  See Polymer Dynamics, Inc. v. Bayer Corp., No. CIV. A. 99-4040, 2000 WL 1146622, at *5 (E.D. Pa. Aug. 14, 2000) (noting that a "plaintiff also can be an enterprise" and citing cases).

court in LaSalle Bank Lake View v. Seguban, 937 F. Supp. 1309 (N.D. Ill. 1996), we are of the opinion that the Scheidler Court's statement cannot be so construed. In Scheidler, the plaintiff-clinics alleged that anti-abortion protesters conspired to conduct the affairs of an enterprise to shut down abortion clinics through a pattern of racketeering activity. Scheidler, 510 U.S. at 253, 114 S. Ct. at 801. The issue in Scheidler was whether the alleged enterprise or racketeering acts must have an economic motive. Id. at 254, 114 S. Ct. at 802. In holding that an economic motive was unnecessary, the court explained that "the 'enterprise' in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." Id. at 259, 114 S. Ct. at 804 (emphasis added). By so qualifying its language, therefore, the Scheidler Court did not foreclose the possibility that the enterprise can also be the victim of the alleged RICO violation. See also LaSalle Bank Lake View, 937 F. Supp. at 1323 ("[T]his court does not agree with the leap of logic made by the Third Circuit from the Supreme Court's Scheidler statement that 'enterprises' 'generally' are not 'victims,' to the conclusion that 'enterprises' cannot be 'victims.'").

Nor can the selected statement from Reves be interpreted to mean that §§ 1962(a) and (b) hold a monopoly on situations where an enterprise has been

victimized. The issue in Reves was how much involvement in a corporation's affairs an outside accounting firm must have in order to be deemed a participant in the conduct of those affairs. See Reves, 507 U.S. at 176–77, 113 S. Ct. at 1168–69. The Court held merely that the defendant "must participate in the operation or management of the enterprise itself." Id. at 185, 113 S. Ct. at 1173. The Court's statement that "Congress consistently referred to subsection (c) as prohibiting the operation of an enterprise through a pattern of racketeering activity and to subsections (a) and (b) as prohibiting acquisition of an enterprise,'" id. at 182, 113 S. Ct. at 1171, thus underscored the Court's application of an "operation or management" test, not the validity of a victim/vehicle distinction.

Our holding today is consistent with our en banc opinion in United States v. Goldin Industries, Inc., 219 F.3d 1268 (11th Cir. 2000), in which we held that in the context of a § 1962(c) charge, the requirement of distinction "between the RICO person and the RICO enterprise is necessary because the enterprise itself can be a passive instrument or victim of the racketeering activity. See Bennett [v. United States Trust Co. of New York], 770 F.2d [308, 315 (2d Cir. 1985)] ("Such a distinction focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.")." Id. at 1270 (emphasis added). We believed then, as we do now, that

78

"Congress' intention in § 1962(c) to target a specific variety of criminal activity [includes] 'the exploitation and appropriation of legitimate businesses by corrupt individuals,'" not merely the use of an enterprise to swindle third parties. See Goldin Indus., Inc., 219 F.3d at 1270.

Accordingly, Devaney's argument to vacate her convictions on Counts 1 and 2 on this ground is without merit.

B.

Devaney also challenges her conviction on Count 1 on the ground that the Government did not present sufficient evidence of an agreement between Devaney and Browne on the overall objective of the conspiracy or an agreement by Devaney to commit personally two predicate acts. Our review of the evidence in the light most favorable to the Government indicates that there is more than enough evidence in the record to support her conviction beyond a reasonable doubt on the former theory, and we therefore do not reach the latter.

Devaney's insufficiency challenge rests on the flawed argument that the evidence supporting her conspiracy conviction requires "careful parsing" by eliminating the predicate acts found to be committed by Browne alone, the predicate acts found to be committed by herself alone, and the predicate acts that the jury found had not been committed. Having done so, she points to Count 2's

79

Predicate Act 14 – mail fraud connected to the submission of an expense voucher on November 28, 1997 – as the only act that the jury found that Browne and Devaney had committed jointly. She argues that based on that act, the evidence is insufficient to show either an agreement on an "overall objective" or the existence of a "single objective" conspiracy.

Devaney's argument fundamentally misconstrues the law and unduly constricts the scope of evidence that may be considered by a jury with respect to a RICO conspiracy charge. First, we note that Count 1 did not incorporate by reference the substantive RICO charge in Count 2. Rather, it alleged a pattern of racketeering activity from 1993 to 2003, consisting of multiple acts including Taft-Hartley violations, embezzlement, bank fraud, and mail fraud. Thus, in proceedings on Count 1, the Government was not limited to proving the specific predicate acts charged in Count 2. Furthermore, Count 1 centered on the act of agreement:

> whether or not the jury believed that [the defendant] actually committed the predicate acts has nothing to do with whether the jury believed that he agreed to commit the predicate acts. Agreement to commit two predicate acts, and not the actual commission of two predicate acts, is the key issue in a RICO conspiracy charge.

United States v. Russo, 796 F.2d 1443, 1461 (11th Cir. 1986). Accordingly, "the jury was free to consider any act of [the type alleged as racketeering activity in

80

Count 1] that occurred within the time frame of the conspiracy." United States v. Phillips, 874 F.2d 123, 127 (3d Cir. 1989); see also United States v. Elliott, 571 F.2d 880, 911 (5th Cir. 1978) ("We have long followed the rule that the government is not limited to overt acts pleaded in the indictment in proving a conspiracy; it may show other acts of the conspirators occurring during the life of the conspiracy.").

Second, the fact that one conspirator may have been unaware of predicate crimes committed by a co-conspirator does not necessarily negate the existence of a conspiracy. Regardless of the method used to establish the agreement, the Government need not prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or contemplated participating in the same crime. United States v. To, 144 F.3d 737, 744 (11th Cir. 1998); Castro, 89 F.3d at 1451 (citing Pepe, 747 F.2d at 659–60). "[T]he fact that 'each conspirator may have contemplated participating in different and unrelated crimes is irrelevant.'" To, 144 F.3d at 744–45 (quoting Starrett, 55 F.3d at 1544).

Contrary to Devaney's argument, therefore, the evidence in support of Count 1's RICO conspiracy charge was not limited to the predicate act that the jury found was jointly committed by Browne and Devaney as the basis of Count

81

2's substantive RICO violation.  Instead, proof of an agreement on an overall objective may be established through sufficient circumstantial evidence from which a rational jury could conclude beyond a reasonable doubt that Devaney "must necessarily have known" that Browne was also conspiring to participate in the same enterprise through a pattern of racketeering activity.  See Castro, 89 F.3d at 1451.

Devaney relies heavily on United States v. Gonzalez, 921 F.2d 1530 (11th Cir. 1991), to argue that there was no evidence that she agreed with Browne as to the overall objective.  In Gonzalez, Michael Timothy Sweeton was charged with a RICO conspiracy in connection with the LeQuire drug ring which imported cocaine from Colombia to landing strips in Georgia, Alabama, and Tennessee.  Id. at 1533.  Sweeton was a member of a ground crew deployed to a landing site in Sylvania, Georgia, whose job it was to scout the landing area and unload cocaine from an airplane arriving on May 23, 1983.  Id. at 1533–34.  That job went awry, and Sweeton was indicted along with others in the drug ring.  Although this court found that there was sufficient evidence to convict Sweeton under a "single objective" theory, we held that there was insufficient evidence of a "wide[r] agreement" by Sweeton to join a conspiracy with an overall objective of violating RICO.  Id. at 1542–44.  We noted that there was no evidence tying Sweeton to any

82

activity of the drug ring other than the Sylvania incident: "no witness could remember seeing Sweeton, or hearing of his name, prior to the news that something had gone wrong at Sylvania. In contrast to the other defendants, he is not seen, or known of, at or around LeQuire's home or [the] fixed base operation." Id. at 1542. In those circumstances, therefore, we found proof of an agreement to an overall conspiracy to be lacking.

In contrast to the dearth of evidence with respect to Sweeton, there is ample circumstantial evidence to support a finding that Devaney agreed to the overall objective of the alleged enterprise – namely, to control the financial affairs of the union and misuse its assets and influence for personal gain. Browne hired Devaney to be his administrative assistant, in which capacity she came to wield extraordinary control over the books, records, and finances of the union. With that authority, Devaney was able to enrich herself through her payroll scheme and by charging personal expenses to the union. For his part, Browne was able to use his influence to obtain payments from employers. In addition, Devaney's activities both facilitated Browne's fraudulent expenses and shielded them from view. In filling out Browne's expense vouchers, Devaney admitted to fabricating the names of persons attending dinners and ascribing a union-related purpose to personal meals. Devaney herself attended several expensive dinners that were not related

to union business. She also failed to maintain adequate documentation for claimed expenses. Her role thus brought her "squarely within [the alleged] enterprise." See Gonzalez, 921 F.2d at 1541. In turn, Browne warded off the complaints of union officials and accountants who expressed concerns over Devaney's performance and criticized the absence of checks and balances over the union's financial affairs. Indeed, when Zakaib repeatedly requested access to the union's books and records, Devaney appealed to Browne to "take care of it."

The sum of this evidence is such that we cannot say that a rational jury could not have found beyond a reasonable doubt that Devaney agreed to the overall objective charged. We therefore affirm Devaney's conviction on Count 1.

C.

Devaney's third argument on appeal is that the district court erred in refusing to modify the pattern RICO jury instruction with respect to the fourth element of the Count 2.[33] The jury was instructed that the fourth element of the substantive RICO offense required finding beyond a reasonable doubt that Devaney "conducted or participated in the conduct of the enterprise's affairs." Over Devaney's objection, the district court delivered the unmodified pattern

---

[33] The Reves "operation or management" test is applicable to criminal RICO cases. Starrett, 55 F.3d at 1542. However, we have held that the test does not apply to the conspiracy offense, 18 U.S.C. § 1962(d). Id. at 1547.

instruction for this element, which reads:

> [T]he Government must prove beyond a reasonable doubt that the Defendant was something more than an outsider lending aid to the enterprise. It must be proved that the Defendant had some part in <u>either</u> the management <u>or</u> the operation of the affairs of the enterprise itself. Thus, it need not be proved that the Defendant had primary responsibility or even a managerial position; it is enough if the Defendant was involved in conducting the operation of the affairs of the enterprise as a lower level participant.

Eleventh Circuit Pattern Jury Instruction, Offense Instruction 71.1 (2003).

Devaney has no quarrel with the first two sentences of the pattern instruction, which she admits are lifted directly from the Supreme Court's opinion in <u>Reves</u>. Her objection is limited to the second clause of the third sentence. Devaney asked the district court to omit the language that "it is enough if the Defendant was involved in conducting the operation of the affairs of the enterprise as a lower level participant," and to substitute the language: "but the Government must prove beyond a reasonable doubt that the Defendant had some part in directing the enterprise's affairs."

As Devaney's challenge was properly preserved, we review the district court's refusal to accept Devaney's requested modification to the wording of the instruction for an abuse of discretion. <u>See</u> <u>United States v. Prather</u>, 205 F.3d 1265, 1270 (11th Cir. 2000) ("We review the legal correctness of a jury instruction de novo, but defer on questions of phrasing absent an abuse of discretion.") (internal

citation omitted); <u>United States v. Richardson</u>, 233 F.3d 1285, 1292 (11th Cir. 2000) ("'The district court has broad discretion in formulating a jury charge so long as the charge as a whole accurately reflects the law and the facts.'") (quoting <u>United States v. Turner</u>, 871 F.2d 1574, 1578 (11th Cir. 1989). A district court's failure to give a requested jury instruction is an abuse of discretion if the requested instruction "(1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." <u>United States v. Eckhardt</u>, 466 F.3d 938, 947–48 (11th Cir. 2006). Under our deferential standard of review, we reverse only if "we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." <u>Id.</u>

We find no abuse of discretion in the district court's refusal to modify the pattern instruction to incorporate Devaney's proposed language. There can be no doubt that Devaney's proposed instruction was substantially encompassed in the instruction delivered by the district court. The first sentence of the pattern instruction explains that the Government must prove this element beyond a reasonable doubt. The proposed language that a defendant must have "some part in directing the enterprise's affairs" is likewise fully addressed by the second

86

sentence of the pattern instruction, which requires that a defendant must have "some part in either the management or the operation of the affairs of the enterprise itself." To manage or operate an enterprise's affairs is to direct the enterprise's affairs. See Reves, 507 U.S. at 179, 113 S. Ct. at 1170 ("[B]ut some part in directing the enterprise's affairs is required. The 'operation or management' test expresses this requirement in a formulation that is easy to apply."). Notwithstanding Devaney's semantic preference, to incorporate Devaney's proposed instruction would be to render redundant the second clause of the third sentence.

The language that Devaney would have stricken is an accurate reflection of the law in this circuit. The reference to "conducting the operation of the affairs of an enterprise as a lower level participant" contained in the second clause of the third sentence closely tracks the Reves opinion, which states: "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." Reves, 507 U.S. at 184, 113 S. Ct. at 1173. In Reves, the explanation that lower-level participants under the direction of upper management may be found to satisfy the "operation or management" test was necessary to ensure that the Court's finding that the particular outsider in question – i.e., the outside accounting firm – did not operate

87

or manage the enterprise would not unduly restrict the scope of liability for insiders. A defendant must "'knowingly implement[]' and 'make' decisions" in order to be liable under the "operation or management" test, see Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1156 (11th Cir. 2006) (quoting Starrett, 55 F.3d at 1548), but those actions may be performed under the direction of upper management. See United States v. Oreto, 37 F.3d 739, 750–51 (1st Cir. 1994) (stating that "[s]pecial care is required in translating Reves' concern with 'horizontal' connections – focusing on the liability of an outside adviser – into the 'vertical' question of how far RICO liability may extend within the enterprise but down the organizational ladder"; that defendants were liable by being "plainly integral to carrying out the [orders from above]"; and that "Congress intended to reach all who participate in the conduct of that enterprise, whether they are generals or foot soldiers").

Because the pattern instruction given by the district court was legally accurate and was more than adequate in addressing Devaney's proposed instruction, Devaney has failed to establish an abuse of discretion.

## VI.

With respect to sentencing, Devaney contends that the forfeiture order against her should be vacated for two reasons. First, she argues that the district

88

court should not have adjudged her jointly and severally liable for the full amount of the forfeiture order, and should have reduced the forfeiture amount by the amount of her voluntary restitution. Second, she argues that the order of forfeiture violated the Eighth Amendment's prohibition against excessive fines.

"We review de novo the district court's legal conclusions regarding forfeiture and the court's findings of fact for clear error." Puche, 350 F.3d at 1153. Whether a forfeiture order is constitutionally excessive under the Eighth Amendment is also subject to de novo review. Id.

A.

Under 18 U.S.C. § 1963, a trial court must order forfeiture in addition to other penalties for violation of RICO.[34] As individuals convicted under § 1962, Browne and Devaney fall squarely within the forfeiture provision. At sentencing, the district court entered a forfeiture order against the defendants in the amount of $592,254.79, for which they were held jointly and severally liable. This figure was reached by summing the amounts received by Browne from a variety of sources as a result of honest services mail fraud and Taft-Hartley violations

---

[34] In this case, forfeiture was ordered pursuant to §§ 1963(a)(1) and (a)(3), which provide in pertinent part that persons convicted of violating § 1962 "shall forfeit to the United States . . . any interest the person has acquired or maintained in violation of section 1962; [and] any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962."

($468,208.52); the amount received by Devaney through payroll embezzlement and bank fraud ($116,207.66); the amount obtained through the submission of fraudulent vouchers ($4,638.82); expenses stemming from Browne's use of the union cell phone and union calling card ($2,471.79); and the amount connected to Devaney's travel to New York ($1,428.00).

Devaney challenges two aspects of the computation of her forfeiture liability. First, she argues that she should not have been held jointly and severally liable for Browne's honest services mail fraud and Taft-Hartley violations because they were not reasonably foreseeable to her. Second, she argues that the forfeiture amount should have been reduced by the $26,500 of voluntary restitution that she made to the union for her payroll embezzlement. We discuss these arguments in turn and conclude that they fail.

We first considered the issue of joint and several liability in the context of a forfeiture order in United States v. Caporale, 806 F.2d 1487 (11th Cir. 1986). After examining the statutory scheme as a whole and the purpose of the forfeiture provision, we concluded that "imposition of joint and several liability in a forfeiture order upon RICO co-conspirators is not only permissible but necessary in these circumstances to effectuate the purpose of the forfeiture provision." Id. at 1506. To saddle the Government with a requirement "to determine the precise

allocation of racketeering proceeds" between defendants would substantially impair "the effectiveness of [the] remedy," as "offenders would simply have to mask the allocation of the proceeds to avoid forfeiting them altogether." Id. at 1508. It was enough in that case that "the government can prove the amount of the proceeds and identify a finite group of people receiving the proceeds." Id. In Caporale, therefore, the imposition of joint and several liability as a "collection device" was necessary to effectuate RICO. Id. Caporale did not hold, however, that joint and several liability may only be imposed where the Government cannot prove the amount of ill-gotten gains that was funneled to each defendant.

Devaney relies principally upon United States v. Saccoccia, 823 F. Supp. 994 (D.R.I. 1993), aff'd, United States v. Hurley, 63 F.3d 1 (1st Cir. 1995), to argue that a defendant may not be held liable to forfeit the proceeds of racketeering activity generated by a conspiracy that were not reasonably foreseeable to the defendant. In Saccoccia, each defendant was found guilty of a RICO conspiracy violation and one or more related substantive offenses stemming from a conspiracy to launder the proceeds of illegal narcotics sales for a Colombian drug cartel. Saccoccia, 823 F. Supp. at 997. In determining the amount of forfeiture to be imposed on each defendant, the district court looked to the Sentencing Guidelines, U.S.S.G. § 1B1.3(a)(1)(B), which require that "both

91

base offense levels and adjustments for specific offense characteristics be determined on the basis of 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" Id. at 1004. The court concluded that "[s]ince criminal forfeiture is a form of punishment, it follows that the same principles of sentencing accountability should apply." Id. The First Circuit agreed, noting in addition that the same principle underlies established case law holding a defendant substantively liable for the foreseeable criminal conduct of other members of the conspiracy. Hurley, 63 F.3d at 22 (citing Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)). The court decided not "to depart from this principle of attributed conduct when it comes to apply the forfeiture rules, which have aspects both of substantive liability and of penalty." Id.

We respectfully disagree with the reasoning of these opinions, as we do not believe that section 1B1.3(a)(1)(B) can be conflated with the Sentencing Guidelines applicable to forfeiture under RICO. The Guidelines expressly deal with forfeiture in section 5E1.4, which provides in its entirety that "[f]orfeiture is to be imposed upon a convicted defendant as provided by statute." U.S.S.G. § 5 E1.4. The commentary then lists the various statutes, including 18 U.S.C. § 1962, and notes that forfeiture is mandatory and automatic upon conviction of an

92

underlying offense.

Nor do we believe that the "reasonably foreseeable" limitation operative on the imposition of vicarious Pinkerton liability is applicable here. The acts for which Devaney disclaims forfeiture liability are not "merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Pinkerton, 328 U.S. at 648. The RICO conspiracy count of which both Browne and Devaney were convicted alleged, inter alia, that the defendants agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of activity including violations of the Taft-Hartley Act and honest services mail fraud, and one of the multiple objects of the racketeering conspiracy was to use the influence of D1-MEBA, NFOPAPE, and their respective divisions for their personal gain. Accordingly, these offenses were the very objects of the unlawful conspiracy and were committed in furtherance thereof. In that sense, their commission was inherently "reasonably foreseeable" to Devaney.

The fact that Devaney was not herself charged with the commission of the Taft-Hartley or honest services mail fraud predicate acts does not absolve her of liability for the conspiracy. Cf. United States v. Faulkner, 17 F.3d 745, 775 (5th Cir. 1994) ("The RICO offense here is not merely the commission of particular

93

predicate acts, but a conspiracy 'to conduct or participate, directly or indirectly, in the conduct of' an enterprise." (quoting 18 U.S.C. § 1962(c))). Although Devaney claims that the district court ruled on her Rule 29 motion for judgment of acquittal that she had not conspired with Browne with respect to the Taft-Hartley and honest services mail fraud violations, our perusal of the trial record reveals otherwise; the court found sufficient evidence to permit the jury to consider this alleged object of the conspiracy, and the jury's verdict found her guilty of so conspiring with Browne. Thus, the money procured through Browne's Taft-Hartley violations and honest services mail fraud was acquired through racketeering activity directly in furtherance of the objects of the conspiracy and was part of the conspiracy's common pool of proceeds. In this respect the conspiracy resembled a partnership in a criminal plan, in whose proceeds Devaney held an interest.

Our finding that forfeiture in this circumstance is not subject to the same "reasonably foreseeable" limitation that operates on vicarious Pinkerton liability for the substantive offenses of a co-conspirator is also consistent with our opinion in Caporale. In that case, we noted that the imposition of joint and several liability on a forfeiture was not wholly inconsistent with traditional concepts of criminal law and named Pinkerton liability as one example. Caporale, 806 F.2d at 1508.

94

However, our discussion did not stop there; we observed that:

> The imposition of joint and several liability on a forfeiture is even less theoretically problematic than vicarious liability for a substantive conviction might be because it goes only to the penalty imposed rather than to the individual's criminal liability. In addition, traditional notions of criminal law are not altogether analogous because RICO itself by design is not traditional criminal law: it represents a radical departure from common law notions of liability and punishment in criminal law in a number of respects.

Id.[35] Indeed, to hold otherwise would be to assign to the Government the onerous task of proving to the trial judge which proceeds were reasonably foreseeable to each defendant in a conspiracy. Such a move would significantly blunt the effectiveness of a weapon that Congress specifically authorized "to strike at the heart of an illegal enterprise by confiscating tainted property and proceeds in hopes of putting the criminal enterprise out of business." See United States v. Gilbert, 244 F.3d 888, 909 (11th Cir. 2001); see also United States v. Bajakajian,

---

[35] Devaney urges us that it is "incomprehensible" to "graft a common-law principle of vicarious liability and not the common-law limitation on that liability." We note, however, that the imposition of joint and several liability for a forfeiture order operates as a penalty collection device and not as a theory of substantive liability. See Caporale, 806 F.2d at 1508 (noting that forfeiture "goes only to the penalty imposed rather than to the individual's criminal liability"); see also United States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001) ("It is beyond doubt that criminal forfeiture is part of a defendant's sentence. 18 U.S.C. §§ 1963(a), 3554; United States v. Bissell, 866 F.2d 1343, 1349 n.3 (11th Cir. 1989) ("Criminal forfeiture operates in personam against the defendant, serving as a penalty, upon conviction.") . . . ."); cf. Hurley, 63 F.3d at 22 (collecting cases that conclude that forfeiture provisions involve joint and several liability and acknowledging that "[t]his is a somewhat backward way of putting the matter, since 'joint and several' roughly describes the result without explaining the underlying theory of liability"). In this respect, we disagree with Hurley's characterization of forfeiture rules as featuring "aspects both of substantive liability and of penalty," Hurley, 63 F.3d at 22.

524 U.S. 321, 332 n.7, 118 S. Ct. 2028, 2035, 141 L. Ed. 2d 314 (1998) ("It was only in 1970 that Congress resurrected the English common law of punitive forfeiture to combat organized crime and major drug trafficking.").

Devaney also argues that the amount of forfeiture ought to have been reduced by the two checks totaling $26,500 that she sent to the union after an internal investigation discovered that she had embezzled $116,207.66 from NFOPAPE's payroll.  This argument is specious and can be dealt with in short order.  Restitution pursuant to the Mandatory Victims Restitution Act (MVRA) and forfeiture pursuant to 18 U.S.C. § 1963 are both mandatory in this case, and each serves a different goal.[36]  Restitution is to be paid in the full amount of each victim's losses.  18 U.S.C. § 3664(f)(1)(A).  At sentencing, the probation officer, who prepared the Presentence Investigation Report, recommended restitution in the amount paid to NFOPAPE by its insurer, $87,100.  Presumably, this amount reflected the two checks that Devaney sent to the union.

While the focus of restitution is on the victim, forfeiture focuses on the defendant.  In addition to forcing the disgorgement of dishonest profits, therefore, forfeiture is also a punitive action against the defendant.  Caporale, 806 F.2d at

---

[36] The MVRA provides that restitution will be ordered to any victim for "an offense against property under this title, . . . including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  A victim is defined as any person directly harmed by a defendant's criminal conduct in the course of a scheme, conspiracy, or pattern.  18 U.S.C. § 3663A(a)(2).

1507; see also Libretti v. United States, 516 U.S. 29, 39, 116 S. Ct. 356, 363, 133 L. Ed. 2d 271 (1995) (noting that "Congress conceived of forfeiture as punishment for the commission of various drug and racketeering activities," and it is imposed "'in addition to any other sentence'" (quoting 18 U.S.C. § 1963)). Devaney's interest in the proceeds of her payroll embezzlement was forfeited and vested in the United States government upon her conviction, but that interest dated back to the time of the act that made the interest subject to forfeiture – in other words, when Devaney embezzled the money from NFOPAPE. Cf. Gilbert, 244 F.3d at 903 n.38 (noting that under the relation back doctrine, "any subsequent transfer of part or all of a defendant's tainted property does not automatically extinguish the government's superior entitlement to the property"). The fact that Devaney subsequently sent $26,500 to the union does not divest the Government of any portion of its interest in the $116,207.66 obtained through the payroll scheme.

Accordingly, Devaney's challenge to the forfeiture order on these grounds fails.

## B.

Devaney's last-ditch effort to vacate the forfeiture order rests upon the argument that the inclusion of $468,208.52 received by Browne through the Taft-Hartley and honest services mail fraud violations, as applied to her, constitutes an

excessive fine in violation of the Eighth Amendment.

Forfeitures are subject to the Eighth Amendment's prohibition against excessive fines "if they constitute punishment for an offense." Bajakajian, 524 U.S. at 328, 118 S. Ct. at 2033. Subject forfeitures violate the Excessive Fines Clause if they are "grossly disproportional to the gravity of the defendant's offense." Id. at 337, 118 S. Ct. at 2038. This, in turn, is determined by examining three factors: (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant. Id. at 337–40, 118 S. Ct. at 2038–39.

The forfeiture order in question, which was "imposed at the culmination of a criminal proceeding and require[d] conviction of an underlying felony," id. at 328, 118 S. Ct. at 2033, constituted punishment for an offense and was thus a "fine." On the first factor, Devaney was precisely the type of defendant toward whom RICO is principally directed – 18 U.S.C. § 1962(c) targets not just leaders, but also those who operate or manage the criminal enterprise, while 18 U.S.C. § 1962(d) sweeps more broadly to include all persons who conspire to violate any of the other subsections. Second, Devaney faced a statutory maximum of 40 years' imprisonment and $500,000 fine (i.e., 20 years and $250,000 each for Counts 1

and 2), and a Guidelines sentence range of 37 to 46 months' imprisonment and a fine of $7,500 to $1 million. Thus, the forfeiture here was significantly less than the maximum fine allowable under the Guidelines, severely undermining Devaney's argument that the forfeiture order is grossly out of proportion to the gravity of her offense. Third, we consider the harm caused by Devaney's violation of the RICO conspiracy statute. In enacting the statute, Congress "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots" by providing "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Russello v. United States, 464 U.S. 16, 26–27, 104 S. Ct. 296, 302, 78 L. Ed. 2d 17 (1983) (citing Pub. L. No. 91-452, 84 Stat. 922, 923 (1970)) (quotations omitted). That Congress authorized a maximum fine of $250,000 and 20 years' imprisonment each for Counts 1 and 2 further underscores that it viewed such violations as serious transgressions. We adhere to Congress's view that Devaney's violations of § 1962 constitute a significant harm. Moreover, her fraudulent activities and participation in an unlawful conspiracy harmed two labor unions and their members.

Devaney's reliance on Bajakajian is sorely misplaced. In that case, the defendant pled guilty to failing to report $356,144 in cash that he was trying to

take overseas. In finding that his forfeiture of the entire amount was grossly disproportionate to the offense, the Court found significant the fact that the defendant's "crime was solely a reporting offense," and "the violation was unrelated to any other illegal activities." Bajakajian, 524 U.S. at 337–38, 118 S. Ct. at 2038.[37] In this case, Devaney and Browne were convicted of conspiracy to abuse their positions in the unions and to misuse union assets for personal gain and substantive RICO violations. Accordingly, the district court's forfeiture order was within constitutional bounds. Devaney has simply failed to demonstrate that the amount of forfeiture is grossly disproportional to the gravity of her offense.

VII.

For the reasons herein stated, the judgment of the district court is AFFIRMED.

---

[37] The Court also noted that Bajakajian did not fit into the class of persons for whom the reporting statute was principally designed – he was neither a money launderer, nor a drug trafficker, nor a tax evader. Under the Sentencing Guidelines, the maximum sentence that Bajakajian could have received was six months' imprisonment and a fine of $5,000, suggesting a low level of culpability. Finally, the harm that Bajakajian caused was minimal, as it affected only the government "in a relatively minor way." Bajakajian, 524 U.S. at 338–39, 118 S. Ct. at 2038–39.